Rowan vs. The State.

## ROWAN vs. THE STATE.

CRIMINAL LAW. (1). *Bill of exceptions.* (2, 3.) *Change of venue.* (4, 5, 6). *Manslaughter and Murder defined—statutes construed.* (7). *Separation of jury.* (8). *"Due process of law" defined.* (9). *Construction of 14th amendment.* (10). *Sufficiency of indictment — statute construed.*

| | |
|---|---|
| 30 | 129 |
| 79 | 76 |
| 30 | 129 |
| 93 | 74 |
| 30 | 129 |
| 94 | 452 |
| 30 | 129 |
| 96 | 273 |
| 97 | 47 |
| 30 | 129 |
| 105 | 297 |
| 30 | 129 |
| 111 | ⁵162 |
| 111 | ⁵163 |
| 30 | 129 |
| 112 | ⁵313 |

1. Under the statute (ch. 108, Laws of 1869), the defendant in a criminal action has sixty days after the service of a *written notice* of the judgment, to prepare and serve a bill of exceptions.

2. The court is not bound to grant a change of venue in a criminal action in every case, on the defendant's motion, where affidavits are filed tending to show that he cannot have an impartial trial in the county where the offense was committed; but only where the fact is made to appear to the satisfaction of the court; and its denial of a motion will not be reversed unless there appears to have been an abuse of discretion.

3. In this case twelve affidavits were filed in support of the motion for a change of venue, tending to show that there was such a degree of excitement and prejudice against the accused, as would prevent his having an impartial trial in the county of the offense; and against the motion were filed thirty affidavits of citizens of the county who had large intercourse with its inhabitants (as town officers, insurance agents, merchants, postmasters, hotel-keepers, etc.), to the effect that no such prejudice or excitement was known to the affiants, and that they believed an impartial trial could be had. *Held*, that it was not error to deny the motion.

4. The killing of a human being without a design to effect death, by one engaged in perpetrating a crime or misdemeanor not amounting to felony, does not constitute manslaughter in the first degree (under sec. 8, c. 164, R. S.), in any case except where such killing would be murder at common law.

5. One may be convicted of manslaughter in the first degree under said section where the " crime or misdemeanor " which he was engaged in perpetrating at the time of the homicide was an *assault and battery on the person killed*, and the death resulted from the battery; provided there was that kind of malice aforethought which would have made the killing murder at common law. As to this point the court refuses to follow decisions in New York upon a similar statute. 19 Wend., 570; 3 Parker, 377; 49 Barb., 217.

6. To constitute murder at the common law, the homicide must be committed with some degree of deliberation and intelligence, and with the intention of doing some great bodily harm.

Rowan vs. The State.

7. Where defendant was tried on separate counts for murder and man-slaughter in the first degree, and convicted of the latter offense, it appeared that the trial lasted through several days, and that the jury were permitted to separate, both at meal time, ·by night, and over Sunday; and it is not shown by the state that the accused was not prejudiced by such separation. *Held*, that the conviction must be set aside on that ground. *Keenan v. The State*, 8 Wis., 132, followed.
8. The first clause of sec. 8, art. I. of the constitution of this state, which declared that no person should be held to answer for a criminal offense "unless on the presentment or indictment of a grand jury" (except in certain specified cases), was amended in 1870, so as to declare that no person shall be so held to answer "without due process of law." *Held*,
(1) That in view of the history of this section and the known purpose of its amendment, the words "due process of law" therein cannot be held to require, in case of *felony*, a presentment or indictment by a grand jury.
(2) That so much of ch. 137, laws of 1871, as provides that the courts of this state shall possess the same power and jurisdiction to try prose-cutions *upon information* for *all* crimes, as they possess in cases of like prosecution upon indictment, is not in violation of said section as amended.
9. The 14th amendment to the constitution of the United States, which declares that no state shall "deprive any person of life, liberty or property, *without due process of law*," was not designed and does not have the effect, to prevent the states from punishing felonies by crim-inal informations without presentment or indictment by a grand jury; but, as respects the punishment of crimes, the amendment merely requires that this shall be effected through courts of justice by regu-lar judicial proceedings therein, previously prescribed by law.
10. The provision of sec. 12 of said ch. 137, that "in any indictment or information for murder it shall be sufficient to charge that the accused did wilfully, feloniously, and of his malice aforethought, kill and murder the deceased; and in any indictment or information for manslaughter it shall be sufficient to charge that the accused did feloniously kill and slay the deceased," is valid, and is not in viola-tion of sec. 7, art. I. of the state constitution, which secures to the accused the right " to demand ·the nature and cause of the accusation against him."

ERROR to the Municipal Court for *Milwaukee* County.

The plaintiff in error was convicted of manslaughter in the first degree, at the August term, 1871, of the Municipal Court

Rowan vs. The State.

of Milwaukee County, upon the following information : " I, C. K. Martin, District Attorney for said county, hereby inform the court, that on the twenty-eighth day of April, in the year one thousand eight hundred and seventy-one, at said county, James Rowan did wilfully, feloniously, and of his malice afore-thought, kill and murder Charles McKenzie, against the peace and dignity of the state of Wisconsin. I, C. K. Martin, District Attorney for said county, hereby further inform the court, that on the twenty-eighth day of April, in the year one thousand eight hundred and seventy-one, at said county, the said James Rowan did wilfully and feloniously kill and slay Charles McKenzie, against the peace and dignity of the state of Wisconsin." The facts of the case and the instructions of the court fully appear in the opinion. Verdict and judgment against defendant; and he took his writ of error.

*Samuel Howard* with whom was *J. P. C. Cottrill*, for plaintiff in error, urged that the court erred in denying the motion for the change of venue, the affidavits for defendant being strong and positive, and proving the existence of excitement and prejudice in the county, while the affidavits for the state were merely negative averments. As to the amount of proof necessary to procure a change of venue, counsel cited *Cass v. State*, 2 Greene, Iowa, 353 ; *State v. Nash*, 7 Clark, Iowa, 347 ; *State v. Mooney*, 10 Iowa, 506 ; *People v. Long Island R. R. Co.*, 4 Parker, 602 ; *People v. Lee*, 5 Cal., 353. To the point that the court erred in charging the jury as to the degrees of man-slaughter by reading only a portion of the definition as contained in R. S., ch. 164, sec. 8, omitting the important words, " in case where such killing would be murder at the common law," counsel cited *People v. Enoch*, 13 Wend., 159 ; opinion of BRONSON, J., in *People v. Rector*, 19 Wend., 608 ; *People v. Butler*, 3 Parker, 377 ; *People v. Cole*, 4 Parker, 35 ; *Wilson v. The People*, 4 Parker, 641 ; *People v. Thompson*, 41 N. Y., 1 ; *McCann v. The People*, 6 Parker, 630. The court should have granted a new trial because of the separation of the jury during the progress

of the trial, which fact was within the knowledge of the court. *Keenan v. The State*, 8 Wis., 138; *In re Keenan*, 7 Wis. 696; *Gibbons v. People*, 23 Ill., 521.

The motion in arrest of judgment should have been granted because, first: Chapter 137, Laws of 1871, in so far as it allows an information to be filed and a party to be put on trial thereon for felony, contravenes the provisions of the state constitution. Section 8 of article I. of the constitution originally provided that "no person shall be held to answer for a criminal offense unless on the presentment or indictment of a grand jury," with certain exceptions. As amended in 1870, it now provides that "no person shall be held to answer for a criminal offense without *due process of law.*" The term "due process of law," in cases of felony, must be interpreted as meaning "presentment or indictment of a grand jury." *People v. Toynbee*, 2 Parker, 329, 490; *Wynehamer v. People*, 2 Parker, 431; S. C., 3 Kernan, (12 N. Y.,) 432; *Taylor v. Porter*, 4 Hill, 140; *Hoke v. Henderson*, 4 Dev., 1; *Jones v. Robbins*, 8 Gray, (Mass.,) 329; 1 Kent's Com., 623; Cooley's Constitutional Limitations, 351; Story's Commentaries on the Constitution, vol. 3, 661 (1783); *Murray v. Hoboken Land Co.*, 18 How. U. S., 272; *Saco v. Wentworth*, 37 Me., 165. Second: The statute, in so far as it allows a party to be put on trial for a felony merely upon an information, is in violation of the 14th amendment to the Constitution of the United States, which provides that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law." The question then is, whether at the common law an information could be filed for murder, manslaughter, or other felony, and to this point all the authorities say no. Bacon's Abridgment, Title Information; 4 Bl. Com., 310; 1 Chit. Crim. Law, 162, 165, 843–45, 849; 1 Russell on Crimes, 44 *et seq.;* Story on the Const., § 1776 *et seq.; Jones v. Robbins*, 8 Gray, 346. Third: the 12th section of the act of 1871 contravenes the provision of

the 7th section of article I. of the constitution, which provides that in criminal cases the accused shall have the right to demand the nature and cause of the accusation against him. *Fink v. Milwaukee*, 17 Wis., 26; *Twitchell v. Commonwealth*, 7 Wallace, 321; *Norris v. State*, 33 Miss. (4 George), 373.

*The Attorney General*, for the state.

COLE, J.  A preliminary question of practice is raised on the part of the state in this case, which will first be considered. The plaintiff in error was convicted of manslaughter in the first degree at the August term of the municipal court of Milwaukee county, 1871.  The bill of exceptions was settled and signed by the judge of that court on the 25th of January, 1872. It is objected that the bill was not signed during the term at which the plaintiff in error was convicted, and therefore is no part of the record.

Chapter 108, Laws 1869, in substance enacts that in all criminal actions, bills of exceptions may be served, noticed and settled in the same manner and with the like effect as in civil actions; and that all laws relating to the settlement of bills of exceptions in civil actions shall apply to criminal actions.  In civil actions the practice is well settled that a party desiring to have reviewed in this court any ruling of the court below, has sixty days after the service of *written notice* of the entry of the judgment within which to serve upon the adverse party a copy of the bill of exceptions.   Chap. 264, Laws 1860.  It is said that it is an absurdity to require the service of written notice of the judgment in a criminal case, where the defendant must be personally before the court in order to receive sentence.   It is true in such a case it would seem that the defendant had as full notice of the entry of the judgment as it was possible for him to have, but still the legislature has seen fit to provide that a bill of exceptions may be settled in a criminal case after the term, and within sixty days after the service of written notice of the entry of judgment.   There can be no serious question, we apprehend,

as to the power of the legislature to pass such a law, and the language used is too clear and unequivocal to leave any room for construction.   The bill of exceptions was signed and settled within the time provided by law, and is doubtless a part of the record in the cause.   Such other questions in the cause as we have deemed it necessary and proper to decide, will be considered in the order in which they were discussed by counsel on the argument.

The plaintiff in error moved in the municipal court for a change in the place of trial, because, on account of the excitement and prejudice which existed in the community, a fair and impartial trial could not be had in Milwaukee county.  His application was supported by his own affidavit and the affidavits of eleven other persons, citizens of Milwaukee county, one of whom was his brother.   These persons all state in substance that they have heard a great deal of conversation in the city about the plaintiff in error, and about the offense with which he was charged — that they had heard many people say that he was guilty and ought to be sent to state prison, and that many others had said that he ought to be sent to state prison whether guilty or not ; and had expressed the hope and belief that " he ought to be or would be sent up " whether guilty or not.  The plaintiff in error in his affidavit, among other things, states that the testimony taken on the coroner's inquest was published in full in one of the daily newspapers of the city of Milwaukee — that all the English daily papers of the city had published accounts of the legal proceedings taken against him — that in some of these papers having a large circulation, articles were published in regard to him, which were well calculated to prejudice the public mind against him — that some of these articles professed to give the facts about the homicide, but that these statements were wholly untrue, highly exaggerated, or only true in part — that in 1869, he, with two other persons, was indicted on a wholly false charge of committing burglary in a shop, and stealing therefrom jewelry amounting to $20,000 and upwards,

which case was generally commented on in the papers of the city at the time — and that although a *nolle* was afterwards entered upon this indictment, yet the facts of the burglary were much discussed and the false charge that he was guilty of that crime was again extensively reported and circulated — that by these means a general feeling of hostility and prejudice had been created against him among the inhabitants of the county, which rendered it impossible for him to receive a fair and impartial trial thereon.

In opposition to the application for a change of venue, the prosecution presented the affidavits of some thirty persons, citizens of Milwaukee county — some of them town officers, insurance agents, merchants, postmasters, hotel-keepers, etc., — persons accustomed frequently to meet and converse with large numbers of the people of their respective towns and localities, who never heard any unfriendly feelings expressed towards the plaintiff in error ; know of no prejudice existing against him among the people of the county, and fully believe that he can have a fair and impartial trial therein.

Now upon these affidavits it seems to us impossible to say the municipal court erred in denying the motion for a change of venue. It is said that the affidavits in support of the motion were strong and positive in their statements, proving the existence of excitement, prejudice and a general feeling of hostility against the defendant below, while the affidavits on the part of the state were nearly negative in their character and were insufficient to prove that no such prejudice or excitment existed against him. This is not an entirely accurate view to take of such evidence. Whether there was considerable popular excitment and prejudice existing in the community against the defendant—constant and general expressions on the part of the people of unfriendly feelings towards him, were facts about which any one might testify who had the means of knowing the state of public sentiment in the county. And if such excitement and prejudice prevailed as to require a change of the

place of trial, it seems incredible that these thirty persons, town officers, postmasters, insurance agents, merchants, etc., whose duties and business rendered it necessary for them to constantly meet and converse with considerable numbers of their fellow citizens in the county, should be entirely ignorant of their existence. These were facts of a public nature which must have come to their knowledge if they really existed. Our statute provides that all criminal cases shall be tried in the county where the offense was committed, unless it shall appear to the satisfaction of the court, by affidavit, that a fair and impartial trial cannot be had in such county," Chap. 178, S. 1, R. S. But the court has a discretion in the matter, and it must be satisfied from the evidence before it, that the place of trial should be changed on account of the prevalence of such popular feeling and hostility to the accused as to render a fair and impartial trial in the proper county impossible. The municipal court was not satisfied in this case of the existence of any such state of public sentiment against the defendant, and we think the decision was clearly right upon the evidence before it. We were referred to a number of decisions upon the question as to the amount of proof required to secure a change of venue in a criminal case, but we do not deem it necessary to comment on them. In some of these cases it is held that the court has no discretion, but that the applicant is entitled to a change of venue as his right upon complying with the requirements of the statute upon the subject. But this is not the meaning and intent of our statute, which requires the court to be satisfied from the evidence presented, that the applicant cannot have a fair and impartial trial before it grants a change of venue.

On the trial, the defendant, among other requests, asked the court to charge that the facts proven would not warrant a conviction of manslaughter in the first degree. This being refused the court was requested to define the different degrees of manslaughter as defined and declared in the statute. And the court in charging the jury upon that point, read a part of the defi-

nition of manslaughter in the first degree as contained in section 8, Chap. 164, R. S., and charged in these words:

"The first clause of section 8 of said chapter 164 reads as follows: 'The killing of a human being without a design to effect death by the act, procurement, or culpable negligence of any other, while such other is engaged in the perpetration of any crime or misdemeanor not amounting to felony;' and the last part of the section declares that such killing shall be deemed manslaughter in the first degree. If, therefore, the testimony in the case satisfies you that the prisoner dealt the fatal blow without design to effect death, while he was engaged in the perpetration of an assault and battery on the deceased, or in the perpetration of any crime or misdemeanor not amounting to felony, you will be warranted in finding defendant guilty of manslaughter in the first degree, provided that you are satisfied that all the testimony carefully considered brings the prisoner within those provisions of said section above quoted." It is now claimed on the part of the plaintiff in error that there were two errors in this portion of the charge, and first, it is insisted that it was error to give a part only of the section to which the facts were supposed to apply, without giving the whole section. The portion of the section omitted after the word "felony" is: "or in any attempt to perpetrate any such crime or misdemeanor, *in cases when such killing would be murder at the common law, shall be deemed,*" etc.

It is stated on the brief of counsel for the plaintiff in error, that the reason why the municipal judge omitted these words, was, that he held that they belonged to, and exclusively qualified the last clause of the section, and had no relation whatever to the antecedent clause. But any such construction of the section, we think, is incorrect and inadmissible. According to the most obvious import of these words, and the grammatical arrangement of the whole section, they refer to and qualify both clauses. The unintentional killing of a human being by one engaged in the perpetration of a misdemeanor in a case where

at common law such killing would be murder, is declared to be manslaughter in the first degree. By the construction which the court below placed upon the section, such unintentional killing by one engaged in the commission of a misdemeanor was made manslaughter in the first degree. It is manifest that this construction of the statute had a most important bearing upon this case, because under this direction it is fair to assume the jury found the plaintiff in error guilty of manslaughter in the first degree. Now the killing of McKenzie, under the circumstances disclosed in the evidence, would not necessarily have been murder at common law. This, we think, is plain, for it appears that the plaintiff in error was a hotel keeper in Wauwatosa village, five miles west of the city of Milwaukee. During the night of April 26th, 27th, he was in the city. About 3 A. M. of the 27th he procured a livery team, and with one Nicholas Kovitz — a dwarf, about twenty years of age, and four feet two inches in height — started for home. He had been drinking considerably during the night, and was somewhat intoxicated on arriving at home about 4 A. M. A short time thereafter, the deceased, Charles McKenize, who had likewise been drinking heavily, entered the bar-room. The plaintiff in error and McKenzie were wholly unacquainted with each other, not having before met. After McKenzie came in, he, the plaintiff in error, and Kovitz drank three times and the deceased and Kovitz sat down to play in the bar-room at cards for money. The plaintiff in error gave Kovitz money to bet with, and sat down eight or ten feet off in the same room, and as the witness Kovitz thought, went to sleep. Kovitz won the first game, on which $1.00 was staked, and claimed the money. The deceased demanded it back; an altercation ensued, and finally he arose and drew back to strike Kovitz with his fist. Kovitz called upon the plaintiff in error for assistance, when the latter arose suddenly, raised the chair he was sitting in, and struck the deceased a single blow upon the head. No further blow was struck, and no further assault was made or attempted. The deceased on

Rowan vs. The State.

being struck, settled back in his chair, and afterwards rolled off on the floor. Subsequently the deceased, on declining to go to bed, was led from the house into the street, where he fell down. He died a little over forty-eight hours from this time, from the effects of this blow, as claimed by the prosecution.

We think, therefore, that it is very clear that the homicide committed under these circumstances, was not necessarily murder at the common law, for the crime of murder requires that the act of the party committing the homicide be done with some degree of deliberation and intelligence, or with the intent to do some great bodily harm. In this case the plaintiff in error struck the blow while protecting the dwarf from the threatened violence of the deceased. He might have used a degree of force greater than was necessary for this purpose. But he was appealed to suddenly while his mind was more or less clouded by sleep and intoxication, and he struck the deceased with a chair upon the head. The thing used was not necessarily a dangerous weapon, and the blow struck was not necessarily of a dangerous tendency. The misdemeanor he was engaged in perpetrating was an assault and battery, yet it is impossible to say that this was wholly unprovoked. The deceased was about to strike the dwarf, a person physically vastly his inferior. And when the dwarf appealed to his friend for protection, a single blow was struck on the instant. The act done can hardly be said to be one imminently dangerous, nor does it evince a depraved mind regardless of human life. The jury, therefore, should have been instructed that they could not find the plaintiff in error guilty of manslaughter in the first degree, unless they were satisfied from the evidence that the homicide was committed with some degree of deliberation and with intention of mischief or great bodily harm, such as would authorize them in finding him guilty of killing with malice aforethought at the common law.

The statute is taken from that of New York, and its object is doubtless accurately stated by Chancellor Walworth, in the

case of *The People v. Enoch,* 13 Wend., 159–176, as follows: "Some other cases of unintentional killing by persons engaged 'n riots and other misdemeanors, below the grade of felonies, which previous to the revision had also been improperly consid_ ered as cases of murder, contrary to the principles of the ancient common law, are now restored to that grade of homicide to which they properly belong. All offenses of that description are now placed in the class of homicides committed without malice aforethought." Of course, in determining whether the plaintiff in error was guilty of manslaughter in the first degree, it was essentially necessary to apply the common law principle to the nature and quality of the crime, and to see whether upon that principle he was to be adjudged guilty of a crime which came within the statutory definition. Hence the importance of giving with the first clause of the section the qualifying phrase "in case when such killing would be murder at the common law," in order to determine whether the offense was of that grade or degree. A still further objection taken to this construction of the statute, as given by the court below is, that it is erroneous in holding that it applied to cases resulting in the death of the person against or upon whom the misdemeanor was being committed. It is said in the argument on this point — and said truly — that this provision is taken from the statute of New York. It is further insisted that at the time it was adopted here, it had received a construction in that state, which was, that in order to bring a case within the definition of manslaughter in the first degree, it is necessary to show that the accused was committing or attempting to commit some other offense than that of intentional violence upon the person killed. We do not, however, think this provision had any such settled construction in that state when it was enacted here, and we therefore feel at liberty to place our interpretation upon it. And according to our view, if a person commit an assault and battery upon one unlawfully, and unintentionally kill the one against whom the violence is directed, it would fall

within this provision and be manslaughter of the first degree, providing the homicide was under those circumstances which would render the killing murder at the common law. If the plaintiff in error committed an unlawful assault and battery upon McKenzie, it was undoubtedly a misdemeanor. And if, while engaged in the perpetration of that crime by the same act, he killed him without design to effect death, it was manslaughter in the first degree, if the crime possessed the other essential elements of that offense.

It seems to us that this is the natural and proper construction of the section. The language is not the undesigned killing of a human being by the act of one engaged in the commission of a misdemeanor upon some person other than the one killed in cases, etc., shall be deemed manslaughter in the first degree. The statute in terms applies to the case when the accused unintentionally kills the person upon whom he is committing a crime not amounting to felony, as well as to the case where he unlawfully assaults one, and kills a third person standing by, without any intent to do the latter any bodily harm. According to the construction put upon this provision by some of the courts of New York, the misdemeanor must be some distinct and other offense than that of intentional violence upon the person killed. And that when the unlawful assault and battery is upon the person killed, then it constitutes a part of the act itself which produced death. Judge BRONSON, in the case of *The People v. Rector*, 10 Wend., 510–608, when commenting on a like provision in their statute, says: " This section only applies to that class of cases when the accused, when engaged in committing some other crime or misdemeanor, kills a human being by accident or misadventure and without any intent to do him a bodily injury. It has no application where an attack, either with or without an intent to kill, is made upon a particular individual." The same view, substantially, is taken in the case of *The People v. Butler*, 3 Park, C. R., 377 ; *The People v. Skeelvan*, 49 Barb., S. C., 217, and in the case of

*The People v. Foster,* N. Y. Genl. S., 1872, manuscript opinion, and which has been kindly furnished by the counsel for the plaintiff in error. We are unable, however, to adopt this construction of the statute. The language is clearly applicable to a case, when the party causing death, without design, is engaged in committing an assault and battery upon the person killed, and we find no warrant in making such a case an exception. See opinion of PARKER, J., in *Darry v. The People,* 2 Park, C. R., 606–634. If the plaintiff in error killed McKenzie without design to effect death, while engaged in the commission of an unlawful assault and battery upon the deceased, in a case when such killing would have been murder at the common law, then the offense comes precisely within the statutory definition of manslughter in the first degree. And this being the case, there was no error in the charge of the court upon that point, and of course no error in refusing to charge that upon the evidence there could be no conviction of any higher offense than that of manslaughter in the fourth degree, as requested by the plaintiff in error.

After verdict, a motion was made for a new trial on various grounds, only one of which do we deem it necessary to further notice. It appears from the bill of exceptions, that the trial lasted five days and was adjourned over one Sunday. It further appears that during the recess of court, both at noon of each day and each night, and from the 26th to the 28th day of August (the trial continuing through the 29th), the jury separated, and were thus not kept together from the commencement to the close of the trial. It is claimed by the plaintiff in error that this separation vitiated the verdict, and constituted a legal ground for setting it aside and granting a new trial. It appears to us that this position is sound and must prevail. There does not seem to be any controversy about the fact that the jury were permitted to separate as above stated. Doubtless it was within the knowledge of the court, since it is so stated in the bill of exceptions, as a part of the history of the trial. Neither

was there any proof made on the part of the state that this separation of the jury worked no harm to the plaintiff in error. The law upon this subject was settled in this state in the case of *Keenan v. State*, 8 Wis., 132.    In that case Chief Justice Whiton, after referring to the conflict of opinion upon this question, says: "But we think in trials for capital offenses, the better rule is, to hold that unless it appears that the separation of the jurors was not followed by improper conduct on their part, nor by any circumstances calculated to exert an improper influence on the verdict, the verdict should be set aside in case of conviction."    This decision is strictly in point upon the question we are considering.    It is answered on the part of the state, that this is not a capital case, and that therefore the rule in regard to the separation of the jury does not apply to it.    That rule, it is said, was established in *favorem vitæ* exclusively.    In this case the information contained what under the former practice would be called a count for murder, and also one for manslaughter.    And as already observed, the plaintiff in error was found guilty of manslaughter in the first degree.    The case in all its features is precisely like that of *Keenan v. State*, and it is impossible to make any distinction between them.    We do not feel inclined to disturb the rule of that case, and it is manifest if it is applied here, it is entirely decisive upon the question before us.    So that we are compelled to hold that there must be a new trial in the case on account of the separation of the jury during the trial, and because of the misdirection of the court as to what constituted the statutory offense of manslaughter in the first degree.    However, in ordering a new trial, *ex necessitate*, we disaffirm the points made on the motion in arrest of judgment.    But it is due alike to the great importance of those questions as well as to the ability and learning displayed by counsel on both sides, in the argument, that we indicate to some extent our views upon them.    And it is insisted on behalf of the plaintiff in error.

1st.  That chapter 137, Laws of 1871, in so far as it allows

an information to be filed and a party to be put on trial thereon *for felony*, contravenes the provisions of section 8, article 1, of the constitution of this state.

2d. That the same law, in so far as it allows an information to be filed, and a party put on trial thereon *for felony*, contravenes the 14th amendment to the constitution of the United States.

3d. That section 12, of chapter 137, contravenes that portion of section 1, article 1 of the constitution of this state, which provides that in all criminal prosecutions, the accused shall enjoy the right    *   *   *   to demand the nature and cause of the accusation against him."

The first clause of section 8, article 1 of the constitution, originally declared that, "no person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury." This clause was amended in 1870 so as to read, "no person shall be held to answer for a criminal offense without due process of law." Chapter 137 of the laws of 1871, provides that the several courts of this state shall possess and may exercise the same power and jurisdiction to try prosecutions upon information for all crimes as they possess and may exercise in cases of like prosecution upon indictment. This is a prosecution upon an information under this enactment.

Now the first point above stated, really raises this question: Does the amendment change in any way, the force and meaning of the original section of the constitution? It is claimed by the counsel for the plaintiff in error, that the words " *due process of law,*"as used in the amendment, mean simply this, that no person shall be tried for a felony, except " *on the presentment or indictment by a grand jury.*" It is very evident that if this argument is sound, the amendment to the constitution has no force or value whatever, and is a mere nugatory act. It is certainly a fact that cannot be controverted, that this amendment was agreed to by a majority of the members elected to each house of two successive legislatures, and was submitted to, and

approved and ratified by the people at a general election. And it is absolutely certain that the sole and only object was to abolish the grand jury, or to change the constitutional provision which required that all prosecutions for felony should be upon presentment or indictment by a grand jury. This was the sole purpose of the amendment. Now the proposition that an amendment thus agreed to by the members of two legislatures — ratified by a vote of the people — confessedly intended to do away with the necessity of prosecuting for all crimes and felonies by indictment — has changed nothing, and means nothing, but leaves the original provision of the constitution really in force — or rather has merely re-enacted and re-adopted it — is a proposition which surely strikes the mind with some surprise. And yet this is the result of the argument founded upon the language used in the amendment to the 8th article of our constitution. It is an elementary rule, in the construction of statutes, and especially in the construction of so solemn an instrument as a written constitution, to give some effect, if possible, to every part of it. This rule would of course be overthrown by a decision that the amendment amounted to nothing, or rather had precisely the same legal effect and meaning as the original section. What meaning, therefore, is to be attached to the words "*due process of law*," as found in this amendment to our state constitution, will appear from our remarks upon that language, as found in the 14th amendment to the constitution of the United States. The clause in the latter amendment bearing upon this question, is: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without *due process of law*, nor deny to any person within its jurisdiction, the equal protection of the laws."

The exposition of the proper meaning of the words "*due process of law*," as found in the constitution of the United States and in the constitutions of many states of the Union, is a subject which has frequently engaged the attention of

courts and legal writers. And the definitions of these terms, as found in the authorities, are far from being in accord and completely applicable to all the cases which have arisen. Chancellor Kent says: "The words, *by the law of the land*, as used originally in Magna Charta in reference to this subject, are understood to mean due process of law, that is, by indictment or presentment of good and lawful men; and this, says Lord Coke, is the true sense and exposition of these words. *The better and larger definitions of due process of law is, that it means law in its regular course of administration through courts of justice.*" 1 Com., 10th ed., p. 601. Sedgwick on Stat. and Con. Law, p. 531, remarks that perhaps, in most respects, there is nowhere to be met with a better definition of the phrase, than that found in the argument of Mr. Webster, in the Dartmouth College case, which is: "By the law of the land is more clearly intended the general law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is, that any citizen shall hold his life, liberty, property and immunities under the protection of general rules which govern society. Everything which may pass under the form of enactment is not the law of the land." Judge Cooley thinks this definition "is apt and suitable as applied to judicial proceedings, which cannot be valid unless they proceed upon inquiry, and render judgment only after trial." Limitations, p. 354. In *Mayo v. Wilson*, 1 N. H., 53, a case which involved the validity of a statute which authorized the arrest by the selectmen, of persons suspected of traveling unnecessarily on Sunday, the court construed the phrase "*the law of the land*" as used in the bill of rights in the constitution of New Hampshire; and Richardson, C. J., said he had no doubt the words meant the same thing and not an equivalent expression to the phrase by *due process of law*, and he illustrated its meaning as follows: No subject shall be arrested but by the law of the land; that is, by *due* process of law warranted by the constitution, by the common law adopted by the constitution and not altered, or by statutes

made in pursuance of the constitution. Thus, if the house of representatives were to commit or arrest a person for a contempt in their presence, it would be by process of law expressly warranted by the constitution. If this court were to arrest a person for a contempt in its presence, it would be by process of law warranted by the common law adopted by the constitution. When an individual is arrested for traveling on Sunday, it is by process warranted by a statute made in pursuance of the constitution," p. 58. See also *Dartmouth College v. Woodward*, id., 111–129. In *Wynehames v. The People*, 13 N. Y., 378, Judge Comstock defines the terms "*law of the land*" and "due process of law," to mean "that where rights are acquired by the citizen under the existing law, there is no power in any branch of the government to take them away; but when they are held contrary to the existing law or are forfeited by its violation, then they may be taken from him — not by an act of the legislature, but in the due administration of the law itself, before the judicial tribunals of the state," p. 393; see opinions of Judges Johnson and Selden in the same case, pp. 416–433. In *Taylor v. Porter*, 4 Hill, 140, and in *Embury v. Conner*, 3 Coms., 511, the expressions are expounded by Judges Bronson and Jewett, who concur in the opinion that the phrase *due process of law* imports at least a judicial trial, and not a mere declaration of legislative will by the passing of a law. There is a very able discussion of the equivalent expression "by the law of the land," in the case of *Jones v. Robbins*, 8 Gray, 329. In that case it was held that a statute which gave a single magistrate authority to try an offense punishable by imprisonment in the state prison, without presentment by a grand jury, was unconstitutional, because violative of the provision in the bill of rights, which declared that no person should be deprived of his life or liberty, "but by the judgment of his peers, or the law of the land." There is, however, in this case, a dissenting opinion by Mr. Justice Merrick, in which he reviews a great many authorities and demonstrates quite satisfactorily to my mind, at least, that the phrases "by

the law of the land" and "by presentment or indictment of a grand jury," had not acquired, nor been adjudged anywhere to be equivalent or synonymous expressions.

It would be a very laborious task, and would really serve no useful purpose to refer to all the authorities where the expressions " by due process of law " ; " by the law of the land "; " on presentment or indictment by a grand jury" have been considered and defined.    But the result of the better opinion of courts and commentators in this country, in respect to the meaning of the words " by due process of law ; by the law of the land," as used in the constitution of the United States and in various state constitutions is, that they are equivalent expressions, and in the language of Judge Bronson, cannot and do not " mean less than a prosecution or suit, instituted and conducted according to the prescribed forms and solemnities for ascertaining guilt or determining the title to property." Taylor vs. Porter, *supra.* 147.    Thus, the larger and better definition of those terms, spoken of by Chancellor Kent, is that they mean " law in its singular course of administration, through courts of justice." And the object of this limitation upon the powers of the states is to secure to every person within their jurisdiction ,irrespective of color or previous condition, " the equal protection of the laws,'' and that every one should be judged and have his rights determined by the same rules which are applied to settle the rights of the rest of the community.    The historical origin of the 14th amendment to the constitution of the United States, is familiar to all persons in this country.    Prior to its adoption there was a class of persons in the states which on account of the state of public sentiment were particularly exposed to oppressive and unfriendly local legislation.    They were liable to be despoiled of their property, or to be deprived of their rights, privileges, and immunities in an arbitrary manner, and without " *due process of law.*"    And the object of this amendment was to protect this class especially from any arbitrary exercise of the powers of the state governments, and to secure for it equal and impar-

tial justice in the administration of the law, civil and criminal. But its design was not to confine the states to a particular mode of procedure in judicial proceedings and prohibit them from prosecuting for felonies by information, instead of by indictment, if they chose to abolish the grand jury system. And the words "*due process of law*," in this amendment, do not mean and have not the effect to limit the powers of the state governments to prosecutions for crimes by indictments, but these words do mean law in its regular course of administration according to the prescribed forms and in accordance with the general rules for the protection of individual rights. Administration and remedial proceedings must change from time to time with the advancement of legal science and the progress of society, and if the people of the state find it wise and expedient to abolish the grand jury and prosecute all crimes by information, there is nothing in our state constitution as it now stands, and nothing in the 14th amendment to the constitution of the United States, which prevents them from doing so.

The 12th section of chapter 137 provides that " in indictments or informations for murder or manslaughter, it shall not be necessary to set forth the manner in which or means by which the death of the deceased was caused, but it shall be sufficient in any indictment or information for murder, to charge that the accused did wilfully, feloniously and of his malice aforethought, kill and murder the deceased; and in any indictment or information for manslaughter, it shall be sufficient to charge that the accused did feloniously kill and slay the deceased." The information in this case conforms to this provision fully and precisely. It is claimed, however, by the counsel for the plaintiff in error, that this section is invalid, because by the 7th section of the bill of rights the accused is secured the right " to demand the nature and cause of the accusation against him." We do not perceive anything in chapter 137 which deprives him of that right. The information plainly, substantially and formally describes the crime of murder and manslaughter. It does not

contain all the verbiage and tautology found in the old forms. Nor do we think this necessary. The statements that the accused "not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil" with force and arms at, etc., in and upon one — in the peace of God, etc., then and there being, etc., and many other allegations in the old forms of indictment no longer serve any valuable purpose, either for aggravation or embellishment. The safety and rights of the accused will not be compromised or endangered by the omission of all such useless averments or recitals. The information clearly states "the nature and cause of the accusation" against the accused. He is charged with the crime of murder and manslaughter. The particular instrument or means used to produce death are not stated, and the law renders it unnecessary. The means by which a homicide is committed may be material in determining the grade of the crime, but they can hardly be said to constitute an essential part of "the nature and cause of the accusation." The killing of a human being with premeditated design to effect the death of the person killed, is *murder*, whether death is produced by poison, stabbing, shooting or by any other means. And when a person is charged in the manner prescribed in section 12, chap. 137, with the crime of murder, he is fully informed of the nature and cause of the accusation against him. The means or method by which death was produced, could not always be proven as laid in the indictment, and sometimes the variance was held to be fatal. It was doubtless to avoid the consequences of a variance and for the purpose of dispensing with many useless averments in the old forms of indictment, that the legislature prescribed the forms found in this enactment. . We can really see no substantial objection to this legislation.

These remarks dispose of all the questions which we have deemed it proper to notice at this time.

*By the Court* — The judgment of the municipal court must be reversed, and a new trial ordered.