# CHARLESTOWN.

STATE OF WEST VIRGINIA *v.* ROBINSON.

Submitted June 24, 1882—Decided August 25, 1882.

1. If permanent insanity is produced by habitual drunkenness, then like insanity produced by any other cause it excuses an act, which otherwise would be criminal. (p. 740.)

2. When insanity is relied on as a defense to a charge of crime, it must be proved to the satisfaction of the jury, in order to entitle the accused to an acquittal on that ground. If upon the whole evidence the jury believe, that the prisoner was insane, when he committed the deed, they will acquit him on that ground, but not on the fanciful ground, that, though they believe he was then sane, yet, as there may be a reasonable doubt of such sanity, he is therefore entitled to an acquittal. (p. 740 )

3. A person, who is intoxicated, may yet be capable of deliberation and premeditation ; and if the jury believe from all the evidence in the case, that the prisoner willfully, maliciously, deliberately and premeditatedly killed the deceased, they should find him guilty of murder in the first degree, although he was intoxicated at the time of the killing. (p. 740.)

4. A person, who has formed a willful, deliberate and premeditated design to kill another, and in pursuance of such design voluntarily makes himself drunk for the purpose of nerving his animal courage for the accomplishment of the design, and then meets the subject of his malice, when he is so drunk as not then to be able to deliberate on and premeditate the murder, and kills the person, it is murder in the first degree. (p. 741.)

5. A person, whether he be an habitual drinker or not, cannot voluntarily make himself so drunk as to become on that account irresponsible for his conduct during such drunkenness. He may be perfectly unconscious of what he does ; and yet he is responsible. He may be incapable of express malice ; but the law implies malice in such a case from the nature of the instrument used, the absence of provocation and other circumstances, under which the act is done. (p. 741.)

6. If a person kills another without provocation and through reckless wickedness of heart, but at the time of so doing his condition from intoxication is such as to render him incapable of doing a willful, deliberate and premeditated act, he is guilty of murder in the second degree. (p. 741.)

7. Where a statute establishes degrees of the crime of murder, and provides, that "all willful, deliberate and premeditated, killing

| 20 | 713 |
| 36 | 702 |
| 36 | 754 |
| 36 | 770 |
| 20 | 713 |
| 40 | 270 |
| 20 | 713 |
| 42 | 258 |
| 20 | 713 |
| 46 | 322 |
| 20 | 713 |
| 49 | 623 |
| 49 | 626 |
| 20 | 713 |
| 51 | 472 |
| 52 | 225 |
| 52 | 228 |
| 52 | 433 |
| 20 | 713 |
| o55 | 82 |
| 20 | 713 |
| 58 | 20 |
| 20 | 713 |
| 59 | 201 |
| 60 | 584 |
| 20 | 713 |
| f62 | 468 |

shall be murder in the first degree," evidence, that the accused was intoxicated at the time of the killing, is competent for the consideration of the jury upon the question, whether the accused was in such a condition of mind as to be capable of deliberation and premeditation. (p. 741.)

8. As between the two offenses of murder in the second degree and manslaughter the drunkenness of the offender can form no legitimate matter of enquiry; the killing being voluntary, the offense is necessarily murder in the second degree, unless the provocation was of such a character, as would at common law reduce the crime to manslaughter; for which latter offense a drunken man is equally responsible as a sober one. (p. 741.)

9. An act done in *accordance with* a purpose previously formed is not necessarily an act done in *pursuance of* such previously formed purpose. (p. 742.)

10. If a man is temporarily insane from the effect of intoxication, then existing, of course it is impossible for him while in such a mental condition to deliberate and premedidate; and being in such a condition of mind, not having formed a previous purpose to kill his victim and *in pursuance* of such purpose, made himself voluntarily drunk to accomplish his design, he could not be convicted of murder in the first degree. (p. 742.)

11. An instruction, which assumes an important and material fact as true, which is not conceded in the case, should not be given to the jury. (p. 743.)

12. In a criminal case an instruction is not erroneous, which instructs the jury: "If they believe from the evidence &c.," and omits to add, "beyond a reasonable doubt," because, when such instruction is given, it is intended and understood, that before the jury can convict, they must believe the material facts "beyond a reasonable doubt," and if the defendant wants the very words inserted in the instruction, he must ask to have it done, or ask for a general instruction on the subject. (p. 743.)

13. An instruction, which is confused in its language, contradictory in its terms and unintelligible, is calculated to mislead the jury and should not be given. (p. 743.)

14. While the Appellate Court cannot reverse a judgment in a criminal case, because the bill of exceptions shows, that an erroneous instruction has been given at the instance of the prisoner, which is mischievous in its character, yet the court may properly point out such error, so that it may be avoided upon the second trial and in other cases. (p. 744.)

15. A mere separation of the jury will not entitle the person to a new trial; but where there has been an improper separation of the jury during the trial, if the verdict is against the prisoner, he is

entitled to the benefit of the presumption, that such separation has been prejudicial to him, and the burden of proof is upon the prosecution to show beyond a reasonable doubt, that the prisoner has suffered no injury by reason of the separation. If the prosecution fails to do this, the verdict will be set aside. (p. 755.)

16. The same rule should be applied, to all cases of misconduct or irregularity by the jury during the trial, which is of such a character as to raise a presumption, that the prisoner was prejudiced thereby. (p. 755.)

17. The testimony of the jurors may be received to disprove or explain any such separation, misconduct or irregularity, but their testimony will not be received to show, by what motives they were actuated, or that any admitted fact, misconduct or irregularity had no influence or effect upon their minds in producing the verdict. In any case where proper at all the testimony of jurors should be received with great caution.     (p. 756.)

18. Where two of the jury trying a felony-case were taken in charge of an officer to the foot of the stairs in a hotel, where the jury were staying, and then the officer left them and they went into a water-closet, and a stranger had just gone into the closet before them and, afterwards another stranger went into the same water-closet, and the officer's back was turned on them, when the stranger went into the closet, and the two jurors remained in the closet some time in the absence of the officer with the strangers, this is such a separation of the jury, as will entitle the prisoner to have the verdict set aside and a new trial granted, though there be no evidence, that conversation was had between the strangers and the two jurors while in the closet, about the case then on trial. And the presumption, that the prisoner was prejudiced by such separation of the jury, is not rebutted by the several affidavits of all the jurors and the officers having them in charge made before the affidavit of such separation, that there was no separation of the jury during the trial and no opportunity offered any one to tamper with the jury.     (p. 759.)

19. A motion made, before the court adjourned, based on an affidavit of such separation, filed after sentence passed on the prisoner, a sufficient reason being shown for not filing it sooner, to set aside the judgment and sentence and grant prisoner a new trial is not too late. (p. 760.)

20. It is a sufficient reason for not filing the affidavit sooner, that affiant was keeping out of the way to prevent his affidavit of such separation being taken, and it could not by reasonable diligence be sooner procured. (p. 760.)

21. The reception of sealed letters by jurors during the trial of a felony, and especially a capital case, renders the verdict vicious; and it should be set aside and a new trial granted the prisoner,

who has been convicted, although the jurors in the absence of the letters swear, that none of such letters so received in any manner related to the case on trial. (p. 761.)

22. Before letters addressed to members of a jury, while trying a felony case, are received by them, they should first be inspected by the court, so that the court can know, that no influence calculated to prejudice the prisoner was in that way brought to bear upon the jury. (p. 762.)

23. The mere reading of newspapers by members of a jury, while trying a felony case, will not vitiate a verdict rendered against a prisoner, unless such newspapers contain matter calculated to influence the minds of the jury against the prisoner to his prejudice. (p. 762.)

24. A newspaper containing an account of a horrible murder in no way connected with the case on trial read by the jury, while trying a murder case, is not calculated to prejudice the minds of the jury against the prisoner. (p 762.)

25. But where the jury were trying a prisoner for murder, and the defense was insanity superinduced by long continued habits of intoxication, and while trying the case the jury were permitted to read newspaper accounts of the trial of Guiteau for the murder of President Garfield, then in progress, in which the only defense was insanity, which accounts contained the expert testimony of Dr. Gray on the subject of insanity generally, and in which testimony he ridiculed the idea, that any such thing as "moral insanity" existed and termed "dypsomania" "drunkenness," under the circumstances of the case the reading of such newspaper accounts was calculated to influence the minds of the jury against the prisoner and to his prejudice, and for this reason the verdict should be set aside and a new trial granted. (p. 763.)

26. Before a jury trying a felony case should receive newspapers, such newspapers should be inspected by the court, and all objectionable matter be cut out. (p. 762.)

27. The fact that the jury at a hotel during the trial of a felony case occupied two separate rooms, each portion of the jury being in charge of an officer, does not constitute a separation of the jury. (p. 763.)

Writ of error and *supersedeas* to a judgment of the circuit court of the county of Kanawha rendered on the 10th day of January, 1882, in a trial on an indictment for murder in said court then pending, wherein the State of West Virginia was complainant, and William H. Robinson was defendant, allowed upon the petition of said Robinson.

Hon. Frank A. Guthrie, judge of the seventh judicial circuit, rendered the judgment complained of.

The facts of the case are fully stated in the opinion of the Court.

*Kenna & Chilton* for plaintiff in error cited the following authorities: 20 Gratt. 874; 5 Ohio N. S. 77; Whart. Crim. L. (8th Ed.) § 48; 8 W. Va. 320; 7 W. Va. 715; 18 Gratt. 801; 17 Gratt. 472; 1 Am. Crim. R. (9 Bush Ky.) 309; 1 Bish. Cr. Pro. (3d Ed.) 979; 9 Leigh 678; 12 Gratt. 153; 6 W. Va. 51; 3 W. Va. 645; *Hopt's Case* U. S. Sup. Ct. R.; 1 Whar. Crim. § 33; 1 Bish. Crim. L. 335; *Id.* 404; *Id.* 409; 14 Ohio 555; 9 Humph. 663; 11 Humph. 154; 1 Grant 484; 44 Pa. St. 55; 75 Pa. St. 403; 21 Cal. 544; 43 Cal. 344; 40 Conn. 136; 41 Conn. 584; 1 Whart. Crim. L. (8th Ed.) § 51; 8 Ohio St. 435; 11 Minn. 154; 13 Minn. 341; 30 Wis. 74; 3 Park. Cr. Rep. 632; 6 W. Va. 257; 14 W. Va. 100; 8 Humph. 597; 6 N. H. 352; 5 N. H. 93; 5 Mass. 405; 14 Mass. 245; 3 Park. Cr. Rep. 25; 12 Gratt. 689; 10 Yerg. 241; 13 Sm. & M. 398; 26 Miss. 78; 2 Swann (Tenn.) 378; 8 Wis. 132; 43 Miss. 364; 21 La. Ann. 321; 1 Tex. 248; 37 Tex. 366; 37 Wis. 396; 30 Wis. 129; 16 Minn. 178; 23 La. Ann. 213; 5 Ga. 85; 27 Ind. 1; 56 Ga. 653; 6 N. H. 352; 5 Cal. 275 . 7 N. H. 287; 21 Ill. 375; 3 Minn. 444; 5 N. H. 93; 5 Mass. 405; 5 W. Va. 380; 1 Va. Cas. 271; 8 Gratt. 712; 19 Gratt. 485; 2 Leigh 745; 11 Leigh 633; 1 Rob. 756; 6 Leigh 615; *Sperry's Case* 9 Leigh; *Hooker's Case*, 13 Gratt.

*Attorney-General Watts* for the State cited the following authorities: 20 Gratt. 868; 1 Bish. Crim. L. §§ 409, 410; 11 Minn. 154; *Id.* 162; 13 Minn. 359; 1 Dav. 227; Addison 255; 1 Spars (S. C.) 391; 16 Ind. 428; 40 Ind. 275; *Haile v. State*, 11 Humph.; 8 Ind. 330; 2 Hill (S. C.) 619; 43 Cal. 345; 1 Curtis 1; 5 Mass. 28; 18 N. Y. 9; 9 Humph. 663; 21 Cal. 516; 3 Gray 466; 107 Mass. 453; *State v. Underwood*, 57 Mo.; 1 Am. Cr. Rep. 251; 28 Ark. 155; 12 Pick. 496; 30 Ill. 256; 7 R. I. 336; 22 Cal. 348; 1 Cow. 221; 19 Cal. 426; 23 Ind. 89; 10 Yerg. 529; 24 Ind. 15; 19 Ill. 74; 13 Sm. & M. 398; 20 Ga. 752; Hayw. 238; 5 Ind. 58; 2 Ind. 435; 9 Humph. 646; 46 Cal. 337;

25 La. Ann. 573; 3 Foster (N. H.) 801; 29 Com. 100; 2 Vroom (N. J. L.) 249; *Hall's Case* 6 Leigh; 20 Kan. 643; 90 Ga. 102; 46 Miss. 683; 13 Ark. 319; *Marsh v. State*, 44 Tex.; 18 Gratt. 983; 19 N. Y. 550; 24 Ind. 751; 11 Ind. 513; 28 Ark. 155; 5 Leigh 598; 4 Leigh 635; 1 Gra. & Wat. New Trials 84; 2 Barnes 441; 3 Foster (N. H.) 301; *Thompson's Case*, 8 Gratt.; 16 W. Va. 753; 8 W. Va. 686; 12 How. 361; 2 Sumner 19.

Johnson, President, announced the opinion of the Court:

William H. Robinson was on the 9th day of December, 1881, indicted in the circuit court of Kanawha county for the murder of Allen Belcher.   On said indictment his trial was commenced before a jury in said court on the 2d day of January, 1882, and on the 6th day of January, 1882, the jury returned a verdict of murder in the first degree.   The prisoner by counsel moved to set aside the verdict, because, first, the verdict was contrary to the law and evidence in the case; second, because the jury were mislead by the instructions of the court given at the instance of the State, and particularly by the second instruction; third, because the instructions so given did not propound the law correctly; fourth, because of the misconduct of the jury and the officers, who had them in charge, as shown by the affidavits filed.   The court overruled the motion for a new trial and entered judgment upon the verdict, and sentenced the priso- to be hanged on the 7th day of April, 1882.   To this judgment the prisoner obtained a writ of error.

Upon the trial the prisoner tendered two bills of exceptions, which were signed by the court and made part of the record.   The first sets out all the evidence and facts proved in the case, the instructions given and the affidavits of various persons to show misconduct in the jury and officers in charge thereof during the trial and is to the refusal of the court to set aside the verdict for the reasons before alleged. The second contains affidavits of several persons to after-discovered evidence of the separation of the jury, and is to the refusal of the court to set aside the sentence of the court, and the verdict of the jury, and grant a new trial for the reasons stated in said bill of exceptions.

It is proper to state the substance of the facts proved, in order to show the bearing of the instructions based thereon.

The evidence and facts proven by the State were substantially as follows: "The defendant resided at Malden, Kanawha county; some time before the shooting Robinson, while intoxicated, stated on three or four occasions, that if Belcher or Putney attempted to arrest him, he would kill him; Putney was mayor and Belcher marshal of said town of Malden; on the 15th day of November, 1881, said Robinson and one Martin passed along the street in front of the store, where Putney was employed, said Robinson was then intoxicated, staggering and singing; that on that day at about eleven o'clock Robinson, when drunk, declared that if Putney or Belcher put his hands on him, he would kill him; on said day between one and two o'clock said Robinson, when 'deep in liquor,' said to one Hoffman: 'Do you see that fellow yonder?' referring to said Belcher, 'if he bothers, you will see;' said Robinson was seen on three occasions on that day, 'deep in liquor;' that about eleven o'clock he asked one Beasley to take a drink, and he refused and advised Robinson not to drink any more; Robinson said: 'If old Dick Putney or Belcher fooled with him he would kill him;' Beasley saw Belcher and told him this, and told him to keep his eye on Robinson; Belcher said he would watch him. Robinson in company with Jim Martin and Peter Beasley, pulled out his pistol and said, 'if Uncle Dick, or any of his crew tried to arrest him he would leave some of them in the road.' Robinson was drinking but witness thought not drunk. Belcher was sitting at Coleman's store near by and walked away, near twelve o'clock on that day said Robinson pulled out a revolver and cocked it and remarked, that 'he wanted to see, if he was ready for these corporation sons of bitches.' On that day Robinson was under the influence of liquor, and had been for some days previously, but early that morning was sober and acted all right. Three weeks before said 15th day of November, 1881, said Robinson declared, when intoxicated, that said 'Belcher was as afraid of him as a Red river wolf.' All of said declarations of Robinson were made, when he was intoxicated. Said Robinson also declared, when drinking, that 'he had a claim against the corporation,

and that Belcher and Putney were trying to keep him out of his money, and if Belcher fooled with him, he would use his knife on him.' Prior to the shooting said Putney had arrested said Rrobinson for cutting one Brown; and said Robinson had not been friendly with him since. Said Putney had seen said Robinson and Brown go into a saloon together after said cutting and before the shooting; said Putney had prohibited the saloons from selling said Robinson liquor, and Robinson had not spoken to him since. Said Robinson on said day frequently had his pistol in his hand and exhibited it to public view. Robinson in the forenoon of that day said to Christy, that 'some people carried revolvers and did not know what they would do; he had one, and if Putney or Belcher fooled with him, one of us would have to be put out of the way.' Christy told Belcher this, and Belcher laughed. Milton Snyder saw Robinson two or three hours before the shooting, and Robinson said 'if Putney or Belcher attempted to arrest him, he would kill him;' he had a similar conversation with Robinson two or three weeks before. Said Snyder told Robinson not to do it; but he persisted he would; said Robinson was drinking, but said Snyder did not think him drunk. Robinson always seemed to think they were trampling on his rights by shutting up his saloon on Sunday, which Belcher had done as town-marshal. Said Snyder told Belcher half an hour after not to interfere with Robinson, or he would shoot him. Said Snyder never talked to Robinson on the subject, except when Robinson was drinking. Near four o'clock on said day said Robinson walked out Commmercial street in said town of Malden and was followed by said Belcher, who was about twenty-five yards behind him; said Robinson was then drunk; he crossed said street to the front of Rhodes' barroom on said street, and without entering, returned to Snyder's corner with his pistol in his hand, and stood there in company with one Martin who was also drunk. Said Belcher in the mean time, passed up said street, following Robinson as far as Putney's store, and crossing the street to the other side he entered the store, and said to Putney, the mayor, and to young Putney, the son of the mayor, "I will be killed in a few minutes or have to kill somebody,

fix yourself; Robinson and Martin are over there drunk, and I am going to arrest Robinson.' Young Putney armed himself and went to the door of the store across the street from and in view of Robinson. Putney, the mayor, commanded the services of one Perry, who went out into the street in front of the store, and in view of Robinson. The mayor also went out into the the street in view of Robinson. Said Belcher preceding said two Putneys and Perry, went out of said store, as Robinson was crossing the street toward Rhodes' saloon, and said Belcher passed up the street beyond the saloon, and returning passed round to a side door of the saloon, and entered the saloon just after Robinson had retraced his steps to Snyder's corner. Said Belcher with his hat drawn down over his eyes as usual, and both hands in his pantaloons started across the street towards the door of said Snyder's house in a diagonal direction, which led by said Robinson to within twenty-four feet of where said Robinson stood, and Robinson cocked his pistol, when Belcher went into Rhodes' saloon. Robinson said : 'Belcher you can't come that; keep your place; don't come any closer,' and Belcher proceeding in said direction until within twenty-four feet of said Robinson, when Robinson said : 'Belcher I will take you first;' and raising his pistol fired. The ball from said pistol took effect in the breast of said Belcher, who staggered, sank down, recovered partially, raised his left hand to his breast, drew his pistol from his pocket in his right hand, fired wildly and instantly died, shot near the centre of the breast, and ranging to the left through the heart. In quick succession shots were exchanged between said Robinson and R. E. Putney, said Robinson firing at Putney first, the ball striking the ground. One shot was fired at said Robinson by David E. Putney, and two by R. E. Putney, when a son of said Robinson arrived on the scene and requested said David E. Putney 'not to kill him,' and he would get his pistol, said Putneys and said Robinson ceased firing. The son then approached said Robinson and took his pistol, when said Robinson was arrested and held in custody and brought to the county-jail some hours afterwards. All said firing was in very close and quick succession, there being seven shots in all. Said Robinson got be-

hind a post when fired at, and said David E. Putney also stood behind a post.  On the way to jail Robinson was asked, if he did not feel badly, when he said that 'he was sorry for his family.'  Campbell's creek bridge was called to his attentention, as they were passing that place, where three men had been lynched, and he remarked to his guard, that 'it wouldn't cheat him out of many of his days if they took him there.'  The shooting took place and the killing was done in Kanawha county.  The State then rested.

The evidence of the defendant showed, that the defendant had an old scar on his head near the top on the back part thereof, with a slight depression in the skull; that such depression might predispose a person to insanity; that it looked to experts as if made by a fall or a blow; that in 1875, in Maysville, Kentucky, and prior thereto for a considerable period defendant had been addicted to excessive use of intoxicating liquors; that on one occasion when under the influence of liquor he drove his family in their night clothes out of the house into the snow, and was taken into custody to prevent him from doing harm to his family; that he attempted to take his own life; that on the 15th day of May, 1875, he was arraigned before the Mason county court in the city of Maysville, Kentucky, on a charge of lunacy, and was regularly and duly adjudged a lunatic and committed to a lunatic asylum.  The record of said court adjudging him a lunatic and committing him to the asylum, is made a part of the record in this case.  It is a fact agreed in the case, that said Robinson was discharged from the lunatic asylum as restored.

The evidence further showed, that his brother-in-law, Geo. Duling, considered Robinson's intellect gone, when he returned from Kentucky, and on account thereof he had little association with him; that near the close of the second year after said return from Kentucky Robinson became again addicted to excessive drinking.

The evidence also showed that Dr. John Parks, who had had thirty-five years active practice in medicine and had studied insanity as a part of his business as a practicing physician, and had had experience in the treatment of insanity in his general practice, was Robinson's family physician

since his return from Kentucky to the present time, and attended his little girl in her last illness, the child dying a week before the shooting; that said Parks had repeated conversations with said Robinson; that said Parks believed, that after said Robinson resumed the habit of drinking some time after his return from Kentucky, he was insane drunk or sober; that when he was sober and not under the influence of passion, he knew the difference between right and wrong; that said Parks believed said Robinson became insane, when he resumed drinking, some time after his return from Kentucky, and continued so up to the time of the shooting; that said Parks formed this judgment from his associations of five or six years with said Robinson and in his family, from his talks to him, from his general conduct and appearance, from the expression of his eye and from his past history, from his habit of intoxication, and from Robinson's telling him prior to the shooting that "there was something wrong up there" tapping his head; that as symptoms of insanity Parks said that Robinson was very wicked and high tempered, and would fly into a passion about anything; that Parks believed it was very easy for an experienced physician to tell an insane man; that Parks supposed, when sober Robinson would know it was wrong to commit murder; that said Robinson had attempted to take the life of his two sons, while seated at the eating table at their home, while he was drinking, and that he was thrown on the bed and disarmed; that on another occasion Robinson, when drinking, took his little girl out of the house in his arms, and when his son came into the street after her, he drew and flourished a pistol, as if he would shoot his son, and was then arrested and the child taken from him, that he was at that time drinking; that before this occurred Robinson had been by his two sons forbidden to come to his house; that Robinson had a sort of restaurant and eating-house in the town of Malden; that Robinson had frequent conversations with Walter S. Shrewsbury; that he would take said Shrewsbury aside as if he had something of great importance to say, and invariably would have nothing to say except, "I am the surest man you ever saw;" that his conversation was simple and silly; that said conduct and his general demeanor and the fact, that he

would close up his saloon on pay-day of the various mines in the neighborhood, when numbers of men after being paid off were in town, and the further fact, that it was currently reported, that Robinson had been in an insane asylum, led Shrewsbury to regard and believe said Robinson to be insane; that Robinson carried a pistol and laid it on a shelf in a closet by him, when painting at Rooke's, and that Mrs. Rooke declined to have him about; that he would hide pistols about his house, under the pillows of his servant-girl and elsewhere; that before going on a spree he would for days before be in such a mood, that persons familiar with him could tell, that he was going to drink; that he did not talk right; that he was at times more easily managed when drunk than sober; that a week before the shooting Robinson lost by death a nephew living in said town, and that eight days before the shooting his only daughter died, the little girl before spoken of; that he was greatly attached to the child; that her death had a bad effect upon him; that he drank harder after her death; that he was drunk the night before the shooting, and for three or four days prior thereto, but was sober early in the morning of the day, on which the shooting occurred; that about noon on that day he had a bottle of whisky; that he had inflicted no actual bodily harm on any member of his family since his return from Kentucky, but had upon one of his sons while in Kentucky; that his brother-in-law, Lewis Duling, believed him insane; that his son, W. L. Robinson, believed him insane, but had seen him only once since July, 1881; that Robinson had said he had no friends; that the servant-girl, a grown woman, who had lived in Robinson's family for five years up to within a few months before the shooting, believed him insane; that two months before the shooting Belcher, the deceased, said to George Hix, that if he undertook to arrest Robinson, he would do it or kill him; that Hix told Robinson of this and Robinson said "he supposed Belcher would not arrest him, unless he did something."

Dr. John Parks further testified that his son Dr. Albert Parks practiced medicine in Malden; that Dr. Albert Parks knew Robinson, and that himself and his son, Dr. Albert, had conferences prior to the shooting about Robinson's con-

dition of mind and agreed, that he was insane; that he, Dr. John Parks, had never treated Robinson for any disease of the mind; that Robinson had committed no crime when sober, that drunk or sober it would not do for any man to " fool" with him, for he was a dangerous man, drunk or sober; that John Parks had not made mental diseases a specialty, but had studied mental diseases as a part of his profession; that James Hix had gone to Robinson's saloon a month before the shooting, and Robinson locked the door on him; that Robinson was very drunk; that Hix thought he was crazy, and got out and did not return; that Hix thought Robinson when sober was all right, but that he was not so when drunk; that Robinson's drinking periods would last about a week, and he took them about once every month; that he, Dr. John Parks, believed Robinson's insanity was caused by drinking.

The prisoner then rested

The State then in rebuttal introduced several witnesses who testified that they believed Robinson to be sane.  Dr. Ewing testified, that he was a practicing physician of thirty years standing; that he was the jail-physician at Charleston, and had presribed for Robinson several times and did not think him insane.  Dr. Carr was physician to United States prisoners in the jail, had talked with Robinson frequently and saw no evidence of insanity, and thought him sane.  Dr. Summers saw him once, and Robinson spoke of painting he had done for the Dr's mother twenty-five years before.  Dr. Bland the superintendent of the West Virginia asylum for the insane saw him once; he with Drs. Ewing, Carr and Summers examined Robinson in the jail December, 1, 1881, to ascertain, whether he was sane or insane, and concluded, that he was not then insane, nor now.  Dr. Bland said he would not have reviewed him in the asylum.  Drs. Bland, Ewing, Carr and Summers all said, they believed, that Dr. John Parks had better opportunities than they had for judging of Robinson's sanity or insanity, and ought to be able to tell better than they.  Dr. Summers said, that if he was on an even footing with Dr. Parks, his judgment would be as good.  Drs. Ewing and Bland said, that insanity is sometimes hard to detect, that an insane man might drive a

sharp bargin, but would not likely be a good business man; that insane inmates of the asylum sometimes talked rationally on some subjects; that a man may be insane a week before and a week after an examination, and still show no trace of it at the time of such examination; that a man who was a maniac the night before would show some evidence of it the next day; that a person might be insane on a single subject, and sane on all others.

H. W. Reynolds testified he knew Robinson well for a long time, and lived across the street from him; that he frequently talked with him; that Robinson spoke to him every time he met him, if twenty times a day; that he closed his saloon on pay-day, when drinking; that he always had something to say; that he did not see anything like insanity about Robinson; that he considered him sane and went on his bond, when he was arrested for drawing a pistol on his son in the street.

J. D. Peebles, keeper of the jail, testified, that he had the custody of Robinson since his confinement in jail on the night of the day, on which the shooting occurred : that next morning he seemed in good condition but somewhat nervous, his hands trembling; that he believed Robinson's mind was all right.

I have given the evidence both for the State and the prisoner almost entire, as it will throw light upon the instructions and other matters in the record necessary to be considered in the case.

The instructions given at the instance of the prisoner are as follows :

1. "If the jury believe from the evidence, that the deceased Allen Belcher came to his death by means of a pistol shot fired by the prisoner William H. Robinson, as alleged in the indictment, and if they further believe from all the evidence in this cause, both for the State, and for the prisoner, that at the time of such killing the prisoner was insane, they must find the prisoner not guilty."

2. "The court instructs the jury, that if they believe from the evidence, the defendant was, to-wit, in the month of May, 1875, upon legal proceedings instituted in Mason county court, in the city of Maysville, State of Kentucky,

found, by a jury, and adjudged by said court to be insane, and was placed in a lunatic asylum of that State, upon said finding and judgment, and was afterwards discharged from said asylum, as restored to sanity, and that the mind of the defendant was so impaired, at the time of said finding and judgment, as to predispose the defendant to a return of insanity upon the use of intoxicating liquors, domestic affliction, or excitement from any cause, and that at the time of the alleged offense, the defendant because of said predisposition to insanity, and the use of intoxicating liquors, or domestic affliction, or any other exciting cause, was insane, they should find the defendant not guilty."

3. "If the jury believe from the testimony that the conduct of Allen Belcher, before and at the time of the shooting, was such as to cause the defendant, sane, or insane, drunk or sober, to believe when he fired the fatal shot that Allen Belcher contemplated, a dangerous assault upon him with a deadly weapon, and that the defendant actually believed, from such conduct of Belcher, that he was in imminent danger of death, or great bodily injury, and under this belief, the defendant fired the fatal shot, they cannot find the defendant guilty of murder in any degree."

4. "The court instructs the jury that if they believe from the evidence, that the defendant was legally adjudged a lunatic, and placed in a lunatic asylum in the State of Kentucky, in the year 1875, and was afterwards discharged from said asylum as restored to sanity, and they further believe from the evidence, that after said discharge and before the alleged offense set out in the indictment, defendant from any cause was insane, then such insanity is legally presumed to continue, until the contrary is proven by the evidence in this case, and the burthen of proof is upon the State, to prove the contrary, by showing a return to sanity by the preponderance of evidence."

Four instructions were given to the jury at the instance of the State, to each of which counsel for the prisoner excepted.

The first instruction so given is:

"The court instructs the jury that every man is presumed to be sane and to possess a sufficient degree of reason to be

responsible for his crimes until the contrary is proved to their satisfaction; that if the jury believe from the evidence, that the prisoner Wm. H. Robinson, fired the shot which caused the death of Allen Belcher, as charged in the indictment, and at the time of the firing of said shot, the prisoner was laboring under such defect of reason, from any disease or combination of diseases, of the mind, or remotely produced by previous habits of gross intemperance, as not to know the nature, or possible consequences of his act, or if he did know, then that he did not know what he was doing was wrong, they will find the prisoner not guilty."

Counsel for the prisoner insist, that this instruction was calculated to mislead the jury and ought not to have been given. They claim it was urged by the State, not so much for what it says, as for what it does not declare; that it is remarkable not for its simple statement of established law, but for the astute and ingenious manner in which by *necessary implication* it excludes from the consideration of the jury important elements of testimony and fact, bearing direct relation to the subject matter of the instruction. It is insisted by counsel, that the language, "previous habits of gross intemperance," necessarily carried the minds of the jury to a period and to conduct so far anterior to the killing, as to preclude the consideration by the jury, of the influence, which may have been exerted on the mind of the prisoner by his excesses in liquor for the several days *immediately preceding* the killing; and that the inference from said instruction is inevitable, that they were not to consider the effect produced on the mind of the prisoner by his recent, and for some days continued drunkenness. It is insisted that such a debauch may have produced *delirium tremens,* which was a question solely for the jury to determine, which, it is insisted under the authority of Judge Story in *Drew's Case,* 5 Mason 28, would have made him irresponsible for his act.

The effect of the instruction is, that if the jury believed from the evidence, that the prisoner at the time of the killing was from any cause insane, they must find him not guilty. In 1 Hale P. C. 32, it is said: "The third sort of madness, is that, which is, *dementia affectata,* namely, drunkenness. This vice doth deprive a man of his reason and puts many

men into a perfect but temporary frenzy; but by the laws of England such a person shall have no privilege by his voluntary contracted madness but shall have the same judgment, as if he were in his right senses."

In *John Barron's Case*, 1 Crim. C. C. 238, Holroyd J. told the jury: "Drunkenness is not insanity; nor does it answer to what is termed an unsound mind, unless the derangement, which it leaves, become fixed and continued by the drunkenness being habitual and thereby rendering the party incapable of distinguishing between right and wrong." The law we think is here laid down correctly, and has been approved by the modern decisions. It would never do to hold, that because a man had been on a drunken frolic for a few days, the jury might find him insane. In *Drew's Case* while the prisoner had been afflicted with *delirium tremens*, yet the *habit* of intoxication was fixed with him and had been long continued. This might all be true and yet the man might be sane. We know as a fact, that many a man has so long continued his habit of drunkenness, as to have *delirium tremens*, and when that passes off, he is again sane. *Delirium tremens* is the *effect* of intoxication. The instruction correctly stated: "If the jury believed from the evidence, that at the time the fatal shot was fired, the prisoner was laboring under such defect of reason, from any disease or combination of diseases of the mind, no matter how produced, or if remotely produced by previous habits or gross intemperance, as not to know the nature and possible consequences of his act, or if he did know, that he did not know what he was doing was wrong, they will find him not guilty."

It would have been manifestly improper to instruct the jury, that if they believed from the evidence, that the prisoner had been drunk for several days, and was so drunk, at the time he fired the fatal shot, that he did not know the nature or possible consequence of his act, or if he did know this, that he did not know, that what he was doing was wrong, they must find him not guilty. The instruction as given was correct. It is substantially the same as an instruction, which was given in *Boswell's Case*, 20 Gratt. 860 and approved as correct.

The second instruction given at the instance of the State is: "If the jury believe from the evidence, that the prisoner, William H. Robinson, fired the shot, which caused the death of Allen Belcher, as charged in the indictment, and that said shot was fired by said Robinson willfully, deliberately and maliciously in accordance with a purpose previously formed in the mind of said Robinson to kill said Belcher, and that said Robinson, when said purpose was formed, and when in a sober condition, knew the nature and possible consequences of his act, and knew what he was doing was wrong, though said Robinson was voluntarily intoxicated at the time of the firing of said shot, and insane from the immediate effect of said intoxication then existing, then they will find the prisoner guilty of murder in the first degree."

Before considering this instruction we will see what the authorities hold as to drunkenness being under any circumstances an excuse for crime, and how far and for what purpose it may be considered by a jury in arriving at the intent with which an act was committed.

"It is not pretended, that intoxication is in any case an *excuse* for crime; but when the *intention* of the party is an element of the crime insanity of any kind or from any cause, which renders the party incapable of forming any intention, and which is not voluntarily induced with a view to a commission of a crime while in that state, may be given in evidence to show, that he is not guilty of the specific crime, with which he is charged. It would not follow, because the accused was in this case intoxicated, that he did not intend great bodily harm to Callinan; he may have been intoxicated and still acted with this criminal intent. This was for the jury to decide from all the evidence in the case." *State of Minn.* v. *Garvey*, 11 Minn. 163. See also *State of Minn.* v. *Gut*, 13 Minn. 341.

"The court also instructed the jury, that in cases of homicide without any provocation the fact of drunkenness is entitled to no consideration; and that 'temporary insanity which has followed as the immediate result of voluntary drinking to intoxication is no excuse for crime.' In all this we cannot concur. If a man designing a homicide drink to

intoxication either to incite his animal courage or prepare some excuse, the killing will be murder. But if sensual gratification or social hilarity without any premeditated crime induced by drinking, surely his condition *may* be such as to reduce even an unprovoked homicide from murder to manslaughter. And if transient insanity ensued, although it should not altogether excuse, yet it should mitigate the crime of the inevitable act. There was some testimony in this case tending to show, that the appellant, when he killed *Landaur*, was intoxicated, and also that such a condition superinduced moral insanity. And the jury had a right to weigh that testimony and determine not only the fact of intoxication but its actual effect on the mind and the will and consequently on the conduct of the appellant. Had they believed, that it was neither simulated nor malicious but without even producing momentary insanity prompted a homicide, which otherwise would not have been perpetrated, they had a right to decide, that the act was not so criminal as murder; and if especially they had been satisfied, that the act was the offspring of momentary insanity, they would not as conscientious triers have doomed such a victim to the gallows. The instruction tacitly concedes, that *permanent* insanity produced by drunkenness may excuse a homicide. And this, contrary to the ancient doctrine is not universally conceded to be American law. And why is it law? Only because no insane man is responsible for insane acts. And why should an insane act prompted by transient insanity have no exculpatory or mitigating effect on the question of crime or of its grade? In Lord Coke's day a man could not avoid a contract on a plea of insanity or of incapacitating drunkenness. That absurdity has long been exploded; and why should its spurious twin—that drunkenness whatever may be its effects is no excuse for crime—be still recognized as law in this improved age of a more enlightened and homogenious jurisprudence? We conclude, that, this instruction did not clearly and distinctly embody the true modern law, and may have been therefore prejudicial to the appellant." Robertson, J., for the whole court. *Smith* v. *Commonwealth*, 1 Duvall, Ky. 227.

"If a man makes himself voluntarily drunk that is no ex-

cuse for any crime he may commit whilst he is so; he must take the consequence of his own voluntary act or most crimes would otherwise be unpunished.

"But drunkenness may be taken into consideration in cases where what the law deems sufficient provocation has been given because the question is in such cases whether the act is to be attributed to the passion of anger excited by the fatal previous provocation; and that passion is more easily excitable in a person when in the state of intoxication than when he is sober. So where the question is whether words ·have been uttered with a deliberate purpose or are merely low and idle expressions the drunkenness of the person uttering them is proper to be considered. But if there is really a previous determination to resent a slight affront in a barbarous manner the state of drunkenness in which the prisoner was ought not to be regarded for it would furnish no excuse." *Rex* v. *John Thomas*, 7 C. & Payne 750. See also *State* v. *McCants*, 1 Speers Rep. S. C. 384.

"On a trial for murder no proof of intoxication at the time of the crime which falls short of showing the defendant to have been utterly incapable of acting from motive will shield him from conviction. If the reason be perverted or destroyed by fixed disease though brought on by his own vices the law holds him not accountable." *Cluck* v. *State*, 40 Ind. 264.

"The law often implies malice from the manner in which the killing was done or the weapon with which the blow was stricken and in such case it is murder though the perpetrator was drunk and no degree of drunkenness will excuse unless by means of drunkenness habitual and fixed madness ensue; but when the question is whether a party is guilty of murder in the first degree it becomes indispensible that the jury should form an opinion as to the actual state of mind with which the act was done, and among other facts any state of drunkenness being proved it is a legitimate subject of inquiry as to what influence such intoxication might have had upon the mind of the offender in the perpetration of the deed." *Haile* v. *State*, 11 Humph. 152.

"Drunkenness can not be given in evidence as an excuse for crime; but when in a case of homicide the jury are to pass on the question of premeditation for the purpose of fix-

ing the degree of the crime drunkenness may be taken into consideration for the purpose solely of passing on the fact of premeditation keeping in view the fact that a drunken man may act with premeditation as well as a sober man." *People* v. *Williams,* 43 California 345.

"If a person while sane and responsible makes himself intoxicated and while intoxicated commits murder by reason of insanity which was one of the consequences of that intoxication and one of the attendants on that state then he is responsible in point of law and must be punished. This is as clearly the law of the land as the other rule which exempts from punishment acts done under *delirium tremens.*" *United States* v. *McGlue,* 1 Curtis C. C. 1.

"If a person suffering under *delirium tremens* is so far insane as I have described to be necessary to render him irresponsible the law does not punish him for any crime he may commit." *Id.* 13. See also *Maconnehey* v. *State,* 5 Ohio St. 77.

"The question made at the bar is whether insanity whose remote cause is habitual drunkenness is or is not an excuse in a court of law for a homicide committed by the party while so insane but not at the time intoxicated or under the influence of liquor. We are clearly of the opinion that insanity is a competent excuse in such a case. In general insanity is an excuse for the commission of every crime because the party has not the possession of that reason which includes responsibility. An exception is when the crime is committed by a party while in a fit of intoxication the law not permitting a man to avail himself of the excuse of his own gross vice and misconduct to shelter himself from the legal consequences of such crime. But the crime must take place and be the *immediate* result of the fit of intoxication *and while it lasts;* and not as in this case a remote consequence superinduced by the antecedent exhaustion of the party by rising from gross and habitual drunkenness. However criminal in a moral point of view such an indulgence is and however justly a party may be responsible for his acts arising from it to Almighty God human tribunals are generally restricted from punishing them since they are not the acts of a responsible being." Story, J., *United*

*States* v. *Drew*, 5 Mason 29. See also *People* v. *Rogers*, 18 New York 9.

"If a drunken man commits willful, deliberate, malicious and premeditated murder he is in legal estimation guilty as if he were sober. If he do it by means of poison knowingly administered or by lying in wait these facts are as conclusive evidence against him as if he had been sober. If from the proof in the absence of such lying in wait or administering of poison it shall appear that the killing was willful, deliberate, malicious and premeditated he is guilty as though he were sober. But in ascertaining the fact of such intention all the concomitant circumstances shall be heard in order to enable the jury to judge whether such deliberate, willful, malicious and premeditated design existed or whether the killing was not the result of sudden heat and passion produced by a sudden and unexpected controversy between the parties but of such a character as not to mitigate the slaying to manslaughter. As between the two offenses of murder in the second degree and manslaughter the drunkenness of the offender can form no legitimate matter of inquiry; the killing being voluntary the offense is necessarily murder in the second degree unless the provocation were of such a character as would at common law constitute it manslaughter, and for which latter offense a drunken man is equally responsible as a sober one." *Pirtle* v. *State*, 9 Hump. 672.

"But although drunkenness in point of law constitutes no excuse or justification for crime still when the nature and essence of a crime is made to depend by law upon the peculiar state and condition of the criminal's mind at the time and with reference to the act done drunkenness as a matter of fact affecting such state and condition of the mind is a proper subject for consideration and inquiry by the jury." *Id.* 670; see also *People* v. *Belencia*, 21 Cal. 544.

In Tennessee murder by statute is in the first or second degree as in our State.

"All the authorities agree that drunkenness is no excuse for crime. Crime when all the acts of hand and mind which constitute it actually exist is not the less criminal when com-

mitted by a person when intoxicated.  A drunken malice is as dangerous and may be quite as wicked as a sober malice; and it is a sorry consolation to a sufferer from a murderous stab and to a community which is responsible for his protection to be told that the act was done by a man who was bound in morals to keep sober and who had the power to keep sober but who had become voluntarily drunk.  Nevertheless it has been held in this State that where a peculiar knowledge was an element of the guilty act requiring nice discrimination and judgment as in passing a counterfeited bank bill knowing it to be counterfeited and where deliberation and premeditation are necessary ingredients of the crime as in murder in the first degree evidence of intoxication is admissible and proper to be taken into consideration by the jury in determining the question as to the guilty knowledge in the one case and as to the deliberation and premeditation in the other.  So if the accused was so drunk as not to know what he was doing the fact of intoxication may doubtless be given in evidence for what it is worth for the purpose or showing that he did not intend at the time to do what he in fact did do."   *Nichols* v. *State*, 8 Ohio St. 438.   See also *Pigman* v. *State*, 14 Ohio 555; *Keenan* v. *Commonwealth*, 44 Pa. St. 55; *Jones* v. *Commonwealth*, 75 Pa. St. 403; *State* v. *Johnson*, 40 Conn. 136; *State* v. *Same*, 41 Conn. 584; *Rogers* v. *People*, 3 Parker's Cr. Rep. 632; *Boswell* v. *Commonwealth*, 20 Grat. 860.

"Drunkenness although carried to the extent that it overcomes the will and incapacitates from controlling the action of the mind is no excuse for a crime; and voluntary intoxication although amounting to a frenzy does not exempt one who commits a homicide without provocation from the same construction of his conduct and the same legal inferences upon the question of intent as affecting the grade of his crime which are applicable to a person entirely sober.  Upon a trial of indictment for murder in the first degree the evidence was to the effect that the prisoner was in the habit of drinking to excess was frequently intoxicated and had been drinking heavily on the day of the homicide.  His counsel requested the court to charge that 'from all the evidence in the case the jury may believe if they see fit that the pris-

oner may have been the victim of an appetite for drink entirely overcoming his will and amounting to a disease and if they did so believe they must acquit the prisoner unless they believed beyond a reasonable doubt that the act was not committed while his mind was overwhelmed by the effects of the liquor so taken.' The court refused so to charge. *Held*, no error; that the effect of the proposition would be to excuse for the crime if committed while the prisoner was laboring under intoxication so that his will was overcome; that the proposition was also objectionable, as it assumed that if the prisoner had become the victim of an appetite for drink overcoming his will and amounting to a disease he should be acquitted although able to distinguish between right and wrong at the time of the homicide and with respect to it." *Flanigan* v. *People*, 86 N. Y. 554.

In the above case at page 561 Judge Miller says, speaking for the whole court: "There was no error in the refusal of the judge to direct the jury as requested by the prisoner's counsel that they could not find the prisoner guilty of more than murder in the second degree. The proposition contained in this request assumes that there was no evidence of premeditation or deliberation upon which the jury could find the prisoner guilty of murder in the first degree. This assumption was not warranted. The evidence shows that about three months previous to the murder the prisoner had been at work as a laborer under the deceased who had discharged or caused him to be discharged; that the prisoner entertained unfriendly feelings toward the deceased; that shortly after the murder he declared that he had fixed him at last; that the deceased had abused him; that he had satisfaction now; that he was not drunk and knew what he was doing and saying and used language indicating that he had acted with a deliberate purpose and a premeditated design to effect his death. It also appeared that he went to the room of deceased and with no immediate cause for provocation and while the deceased lay there unconscious of danger he turned down the bedclothes and stabbed him with a knife to the heart, using strong and abusive language at the time. The evidence was quite clear that the prisoner had conceived the murder of the deceased and even although he was under

the influence of intoxicating drinks it cannot be claimed upon any sound principle that there was no question for the jury to determine as to the deliberation and premeditation of the prisoner."

In the case of *Hopt* v. *Utah*, 14 Otto. 631, the instruction asked by the prisoner in the court below was: "Drunkenness is not an excuse for crime; but as in all cases, where a jury find a defendant guilty of murder, they have to determine the degree of crime, it becomes necessary for them to inquire as to the state of mind, under which he acted, and in the prosecution of such an inquiry his condition, as drunk or sober, is proper to be considered, where the homicide is not committed by means of poison, lying in wait, or torture, or in the perpetration of or attempt to perpetrate arson, rape, robbery or burglary.  The degree of the offense depends entirely upon the question, whether the killing was willful, deliberate and premeditated; and upon that question it is proper for the jury to consider evidence of intoxication, if such there be; not upon the ground that drunkenness renders a criminal act less criminal, or can be received in extenuation or excuse, but upon the ground that the condition of the defendant's mind, at the time the act was committed, must be inquired after, in order to justly determine the question as to whether his mind was capable of that deliberation or premeditation, which, according as they are absent or present, determine the degree of the crime."  The judge refused to give this instruction, but instructed the jury as follows:  "A man, who voluntarily puts himself in a condition to have no control over his actions, must be held to intend the consequences.  The safety of the community requires this rule.  Intoxication is so easily counterfeited, and when real is so often resorted to as a means of nerving a person up to the commission of some desperate act, and is withal so inexcusable in itself, that law has never recognized it as an excuse for crime."

Mr. Justice Gray in delivering the opinion of the court said: "At common law indeed, as a general rule, voluntary intoxication affords no excuse, justification or extenuation of a crime committed under its influence.  *United States* v. *Drew*, 5 Mason 28; *United States* v. *McGlue*, 1 Curtis 1;

*Commonwealth* v. *Hawkins*, 3 Gray, 463; *People* v. *Rogers*, 18 N. Y. 9. But when a statute establishing different degrees of murder requires deliberate premeditation, in order to constitute murder in the first degree, the question, whether the accused is in such a condition of mind by reason of drunkennesss or otherwise as to be capable of deliberate premeditation, necessarily becomes a material subject of consideration by the jury. The law has been repeatedly so ruled in supreme judicial courts of Massachusetts in cases tried before a full court, one of which is reported upon other points. *Commonwealth* v. *Dorsey*, 103 Mass. 412; and in well considered cases in other States. *Pirtle* v. *State*, 9 Humph. 663; *Haile* v. *State*, 11 Humph. 154; *Kelly* v. *Commonwealth*. 1 Grant Pa. 484; *Keenan* v. *Commonwealth*, 44 Pa. St. 55; *Jones* v. *Commonwealth*, 75 Pa. St. 403; *People* v. *Belencia*, 21 Cal .544; *People* v. *Williams*, 43 Cal. 344; *State* v. *Johnson*, 40 Conn. 136 and 41 Conn. 584; *Pigman* v. *State*, 14 Ohio 555, 557. And the same rules expressly enacted in the Penal Code of Utah, § 20. No act committed by a person while in a state of voluntary intoxication, is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive or intent, is a necessary element, is necessry to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent, with which he committed the act. * * * The instruction requested by the defendent clearly and accurately stated the law applicable to the case; and the refusal to give that instruction taken in connection with the unqualified instruction actually given necessarily prejudiced him with the jury."

The judgment was reversed and new a trial ordered.

In *Boswell's Case*, 20 Gratt. 860, it appeared, that " on the evening of the 4th of July, 1870, Boswell (the accused) being drunk and staggering came up King street (in Alexandria) to West street, and upset a barrel in front of a store on King street as he went by; that he turned down West street going in a northerly direction, and keeping on the east side of the latter street; that as he walked along he exclaimed in violent tones, "I will blow his damn brains out; will kill the damn

little sons of bitches;" that there were at the time two little negro girls passing along the west side of West street going in a southerly direction and toward King street, a number of ducks in the street about ten feet from him, and still further on a cart, both the ducks and the cart being between prisoner and the other side of the street, though it did not appear that the cart was between the prisoner and the little girls; that, when about midway of the square, Boswell picked up a brick and casting it across the street, it struck one of the little girls on the right side of the head above the ear; that the girl fell in a dying condition and expired at ten o'clock in the night of that day; that the girl so struck was named Martha French, and was about six years and nine months old; that after throwing the brick Boswell turned and walked to the corner of King and West streets, took off his coat or jacket, put it on the curb stone, and sat down; while there, he was told by a witness not to go away, and replied: 'If I have done anything wrong you can take out your penknife, and cut my throat. I give myself up. If I killed the child, I did not intend to do it;' that Boswell had been grossly intoxicated for a week except on the day preceding the day, on which the alleged crime was committed, and had no previous acquaintance with the deceased."

There was evidence also showing efforts of prisoner to take his life, and other proof tending to insanity. He was in the court below convicted of murder in the second degree and the term of his imprisonment fixed at eleven years. The Supreme Court of Appeals held, that " a person, whether he be an habitual drinker or not, cannot voluntarily make himself so drunk, as to make himself on that account irresponsible for his conduct during such drunkenness. He may be perfectly unconscious of what he does, and yet he is responsible. He may be incapable of express malice, but the law implies malice in such a case from the nature of the instrument used, the absence of provocation and other circumstances, under which it is done. If permanent insanity is produced by habitual drunkenness, then like any other insanity it excuses an act, which would be otherwise criminal.

"If a person kills another without provocation and through

reckless wickedness of heart, but at the time of doing so, his condition from intoxication was such as to render him incapable of doing a willful, deliberate and premeditated act, he is guilty of murder in the second degree."

After having carefully reviewed the authorities cited by the learned counsel for both the State and the prisoner, it seems to us, that there is very little conflict to be found. The court under such circumstances must have steadily in view two objects, the safety of society and justice to the accused. We think we are fully authorized under the authorities to say, that drunkenness is no excuse for crime; at common law the implied malice from his act would doom him·to the scaffold, although he was too drunk, when he committed the deed, to harbor express malice. Now the only change made in the stringent rule of the common law is, that where under a statute, in order to constitute murder in the first degree, deliberation and premeditation are required, upon the question of whether there was on the part of the prisoner deliberation and premeditation, the jury may consider the fact, that he was intoxicated at the time of the killing. The change goes no further. Upon the question of whether the prisoner is guilty of murder in the second degree or manslaughter, the jury are not permitted to consider the drunkenness of the prisoner at all.

We hold the law to be, that, if permanent insanity is produced by habitual drunkenness, then like insanity produced by any other cause it excuses an act, which would be otherwise criminal.

When insanity is relied on as a defense to a charge of crime, it must be proven to the satisfaction of the jury, to entitle the accused to an acquittal on that ground. If upon the whole evidence the jury believe the prisoner was insane, when he committed the act, they will acquit him on that ground, but not upon the fanciful ground, that though they believe he was then sane, yet as there may be a reasonable doubt of such sanity, he is therefore entitled to an acquittal.

A person, who is intoxicated, may yet be capable of deliberation and premeditation; and if the jury believe from all the evidence in the case, that the prisoner willfully, maliciously, deliberately and premeditatedly killed the deceased,

they should find him guilty of murder in the first degree, although he was intoxicated at the time of the killing.

A person who has formed, a willful deliberate and premeditated design to kill another, and in pursuance of such design voluntarily makes himself drunk for the purpose of nerving his animal courage for the accomplishment of the design, and then meets the subject of his malice, when he is so drunk, as not then to be able to deliberate on and premeditate the murder, and kills the person, it is murder in the first degree.

A person, whether he be an habitual drinker or not, cannot, voluntarily make himself so drunk, as to become on that account irresponsible for his conduct during such drunkenness. He may be perfectly unconscious of what he does, and yet he is responsible. He may be incapable of express malice, but the law implies malice in such a case from the nature of the instrument and the absence of provocation and other circumstances, under which the act, is done.

If a person kills another without provocation, and through reckless wickedness of heart, but at the time of so doing, his condition owing to intoxication is such as to render him incapable of doing a willful, deliberate and premeditated act, he is guilty of murder in the second degree.

Where a statute establishes degrees of the crime of murder and provides, that "all willful, deliberate and premeditated killing shall be murder in the first degree," evidence, that the accused was intoxicated at the time of the killing, is competent for the consideration of the jury upon the question, whether the accused was in such a condition of mind as to be capable of deliberation and premeditation.

As between the two offenses of murder in the second degree and manslaughter the drunkenness of the offender can form no legitimate matter of inquiry; the killing being voluntary, the offense is necessarily murder in the second degree, unless the provocation were of such a character, as would at common law reduce the crime to manslaughter, for which latter offense a drunken man is equally responsible as a sober one.

In the light of these legal principles was the second instruction given at the instance of the State erroneous?

The instruction is as follows: "If the jury believe from the evidence, that the prisoner, Wm. H. Robinson, fired the shot, which caused the death of Allen Belcher, as charged in the indictment, and that said shot was fired by said Robinson willfully, deliberately and maliciously, *in accordance with* a purpose previously formed in the mind of said Robinson to kill said Belcher, and the said Robinson, *when said purpose was formed and when in a sober condition*, knew the nature and possible consequences of his act, and knew, that what he was doing was wrong, though said Robinson was voluntarily intoxicated at the time of the firing said shot, and *insane* from the immediate effect of said intoxication then existing, then they will find the prisoner guilty of murder in the first degree."

The instruction is fatally erroneous, because, it does not connect the purpose to kill with the killing. There can in this State be no murder in the first degree, unless it is willful, deliberate and premeditated, and that willfulness, deliberation and premeditation must accompany the act of killing. It must at the time of the killing be present in the wicked heart of the accused, although the reason at the moment of the killing may be so clouded by the fumes of drunkenness, as at that moment to render the prisoner incapable of deliberation and premeditation. A purpose might have been formed in the heart of Robinson years before, or weeks before to kill Belcher, yet he might have abandoned and deplored such wicked purpose, and no such express malice may have been in his heart, when he fired the fatal shot, yet such shot was fired *in accordance with* such abandoned purpose but not in *pursuance of it certainly*. An act done in accordance with a purpose once formed is not necessarily an act done in pursuance of such previously formed purpose.

Another fatal objection to the instruction is, that it instructs the jury, that a man may "willfully, deliberately and maliciously" do an act, when he is *insane* from the immediate effect of intoxication then existing. This is not possible; it is a contradiction. If a man is temporarily *insane* from the effect of intoxication then existing, of course it is impossible for him while in such a mental condition to deliberate and premeditate; and if in such a condition of mind not having

formed a previous purpose to kill his victim and in *pursuance* of such purpose made himself voluntarily drunk in order to accomplish his design, he could not be convicted of murder in the first degree. The instruction is also fatally defective, because it *assumes*, that a purpose was previously formed in the mind of Robinson to kill Belcher, and further because it assumes, that Robinson formed said purpose when he was sober. The jury ought to have been instructed, that if they believed from the evidence, that Robinson had previously formed a purpose to kill Belcher, &c. An instruction which assumes an important and material fact as true, which is not conceded in the case, should not be given to the jury. *Boswell's Case, supra; Leiber v. Commonwealth*, 9 Bush. 11.

The instruction is not subject to the criticism of counsel, " that it instructs the jury to find a verdict for the State upon a mere preponderance of testimony with reference to material elements of the offense, and in every part omits the essential qualification of belief, which is universal in criminal cases, that it must be beyond a reasonable doubt." If the counsel for the prisoner had asked the court to instruct the jury, that unless they believe, that all the elements of the crime charged in the indictment are proved to them beyond a reasonable doubt, the court would have so instructed the jury, and failing to do so it would have been error. But to say, that the omission to insert the qualification in every instruction asked by the State is erroneous, would be to trap the unwary, because it is not generally done, and it is understood, that when it is said in a criminal case if the jury believe from the evidence " beyond a reasonable doubt," is intended and understood and if the defendant wants the very words inserted, he should ask to have it done, or ask the court to give a general instruction on the subject of " reasonable doubt."

The court erred to the prejudice of the prisoner in giving said instruction, for the further reason, that it is confused in its language, contradictory in its terms, unintelligible and calculated to mislead the jury.

The third instruction is: "If the jury believe from the evidence beyond a reasonable doubt, that the prisoner, though intoxicated at the time of firing the shot, which caused the death of the deceased, was capable of knowing the

nature and consequences of his act, and if he did know, then that he knew he was doing wrong, and that so knowing he fired the shot at the deceased with the willful, deliberate and premeditated purpose of killing him, they will find the prisoner guilty of murder in the first degree." This instruction is correct, as we have already seen. We have also seen, that the fourth instruction correctly propounds the law. It is: "To entitle the prisoner to an acquittal, upon the ground that he was insane at the time of the commission of the offense charged in the indictment, such insanity must be proved to the satisfaction of the jury; and in passing upon this question they may look at the whole evidence in the case, as well that for the State as for the prisoner."

Three of the four instructions given at the instance of the prisoner were on the subject of insanity. We have not carefully and critically examined the said instructions; but we have laid down the law on that subject, so that the circuit court will not be apt to go astray in the new trial of this case. Of course this Court could not reverse the judgment in the case because of an erroneous instruction given at the instance of the prisoner; yet standing as we do charged with a sacred duty not only to protect the prisoner in his legal rights, but also to uphold and protect the interests of society, when we see, that an erroneous instruction calculated to hazard the safety of the citizen has been given at the instance of the prisoner and is a part of the record, although the State has not, and could not here have taken any exception to it, we feel it our duty to point it out, so that it will not again be given. The instruction to which we refer, and which is clearly not the law, is the *third* instruction given at the instance of the prisoner, as follows:

"If the jury believe from the testimony, that the conduct of Allen Belcher before and at the time of the shooting was such as to cause the defendant sane or insane, drunk or sober, *to believe*, when he fired the fatal shot, that Allen Belcher *contemplated* a dangerous assault upon him with a deadly weapon, and that the defendant *actually believed* from such conduct of Belcher, that he was in imminent danger of death or great bodily harm, and under this *belief* the defendant fired the fatal shot, they cannot find the defendant guilty of murder

in any degree." This instruction goes to the full length, if not beyond, *Grainger's Case*, 5 Yerger 459, which is not recognized as law. The general doctrine of self defense, is laid down for this Court in *State* v. *Cain, supra.*, to which reference is here had.

We have spent much time in the investigation of this case, and have referred to many authorities, because we deem it of the utmost importance, in this the leading case in this State upon the great question involved to settle the law on a sure foundation.

The other questions left for our consideration relate to the misconduct and alleged separation of the jury. On the question of misconduct it clearly appears by the affidavits that sealed letters were received by said members of the jury during their deliberations on the case; that the Cincinnati *Enquirer* was received and read by the jury, while they were trying the case, which paper contained an account of what was known as the "Ashland murder," which occurred about that time, when it was said, that the parties charged with the crime had broken into a house in Ashland, Kentucky, and had ravished two young ladies, and then murdered them, and also killed a youth, who was sleeping in the same room, and then set fire to the house, which was burned, and described the crime in the most sensational manner; that one of the girls, and the youth her brother who were victims of the Ashland murder, were children of a Mr. Gibbons; that public excitement after said tragedy was great at Ashland, and among friends and relatives of the Gibbons family at Charleston, Kanawha county, W. Va.; that there were several persons in Charleston related to said Gibbons family, and that fact as well as many circumstances connected with said tragedy was known to members of the jury, which tried Robinson.

The affidavits also show, that copies of the Washington *Post*, a daily newspaper puplished in the City of Washington, was received and read by the jury, and it contained an account of the famous Guiteau trial then in progress in Washington City, in which Charles J. Guiteau was being tried for the murder of President Garfield. As every one knows, the trial attracted universal attention, and the only

94

defense interposed for the prisoner was insanity. In that celebrated trial the most noted experts in the country on the subject of insanity were examined on behalf of the United States; among them Dr. John Gray, superintendent of the lunatic asylum at Utica, New York. In one of the copies of the *Post* read by the jury containing a report of the cross-examination of Dr. Gray appears the following:

"Question by Mr. Scoville—What is 'kleptomania?'

"Answer—A word used to express thieving. I don't believe in it. I don't believe many of the so-called 'moral insanities,' I believe they are crimes.

"Question—What do you mean by 'dypsomania?'

"Answer—Some call such a tendency a habit of drinking, I call it drunkenness; I don't call it insanity.

"Question—What do you mean by 'pyromania.'

"Answer—The burning of houses; I call it incendiarism; I call it a crime."

In one of the papers it appeared, that Dr. Gray testified that "he was medical superintendent of the New York State lunatic asylum. He did not believe in moral insanity, and had not for years. That term was intended to signify a perversion of the moral character leaving the intellectual faculties still sound." He was, as the paper showed, examined generally upon the subject of insanity; and in the course of his examination he expressed the opinion very decidedly, that Guiteau was sane. There were also several copies of the local Charleston papers in the juryroom; but I can see no objection to the contents of any except a short paragraph from the *Evening Call*, which is as follows: "There is to be a desperate effort made to save Bill Robinson."

Single affidavits of certain jurors are filed, then the joint affidavit of six of them, and finally the joint affidavit of all the jurors. It is not denied in any of the affidavits, that sealed letters were received by members of the jury, after they were impaneled, although it is denied, that any of the letters had reference to the case, which they were trying.

A. C. Leggett one of the jury says: "He received four letters during his service as such juror, that they were all from parties who are non-residents of the State of West Virginia, and written from outside of the State, and that they

had no reference whatever to the case on trial, nor did either of said letters bear upon, refer to, or in any way affect or relate to the cause on trial, either directly or indirectly."

S. W. Jordan, another juror, says: "He received only two letters during his service as such juror, that they were both from affiant's wife, and had no reference whatever to the case on trial."

D. A. Moore, another juror, says: "He received one letter. The said letter was delivered to affiant by one of the said officers, J. C. Sattis, as affiant recollects. * * The said letter was from affiant's brother in Texas and was entirely foreign to the case on trial and contained no reference whatever thereto."

All the other nine jurors swore, that they received no mail matter whatever, while they were on the said jury.

J. C. Sattis, one of the officers in charge of the jury, says, that "no restraint was placed upon said jury with reference to current newspapers; that some of them had from time to time read such papers, and that some of the jury sent to the postoffice, and read at different times their mail, both letters and papers, which were not inspected by said affiant, or his associate officer in charge, or by any officer of the court, or by the court, but said mail matter was only sent for and received in the person of affiant and Calvert (another deputy sheriff), but not inspected by them."

The joint affidavit of all the jurymen states as follows: "None of them know of any tampering or attempt to tamper with them or any of them at any time during their service as such jury; that they were guarded regularly during the term of service by one or more of the officers of the court, while all together, at night after bed-time, they were kept in custody as stated in other and separate affidavits filed in this case.

"Affiants further say that they observed faithfully on their part, the obligation of the oath administered by the court to their officer; that they neither conversed with any one, nor allowed any one to converse with them at any time touching the case on trial; that had they so desired they were so well guarded, that any conversation or interference touching this case would have necessarily come under the observation of

their custodians. Affiants further say, and each of them for himself says, that there was not in any way or, under any circumstances, any influence brought, to bear directly or indirectly, or attempted to be brought to bear, upon him or them, affecting or relating to his, or their deliberations, conclusions or actions, as jurors upon said case; nor was there so far as affiants know respectively, any such effort made upon any member of the jury, at any time or in any manner, during their aforesaid service.

"Affiants further say that during the time of all necessary separation on the part of individual members of the jury, no opportunity was given or afforded, on part of affiants, as jurors, or of the officers in charge, to any one to talk with them about the case on trial, or in any manner tamper with or influence them as jurymen.

"Affiants further say, that they brought all their energies, their calm deliberation, earnestness of purpose and most serious consideration to bear, in their endeavor, to do strict and impartial justice, between the State and the prisoner on trial; that prior to the case being finally submitted to them, for their deliberation and verdict, affiants refrained from talking even with each other, in any manner whatever, or to any extent whatever about the case.

"Affiants further say, that they were not in any manner, affected or influenced, even in the remotest degree in their consideration of this case, by any newspaper or newspapers, had or received by any of affiants; that there was no ill design, on the part of affiants, in getting or securing the newspapers, referred to in the other affidavits filed in this case, and in fact that affiants did not know or suppose, that it was in any way irregular, or improper, to see and look over the current, or even local newspaper, which might incidentally get into their possession.

"Affiants all say, that no newspapers or other mail matter was received or inspected by them, or any of them after the case was submitted to them for deliberation and verdict.

"Affiants further say, that prior to their service as jurors in this case they all read more or less frequently the newspaper accounts of the proceedings had, and the medical expert testimony given in the Guiteau murder case now in pro-

gress in Washington, D. C. and which trial had been going on for some weeks prior to the commencement of the trial in this case.

"Affiants further state, that the Ashland murder case, according to newspaper accounts, referred to in John C. Sattis' affidavit occurred prior to the commencement of this trial, and news thereof had been received in this community prior to the commencement of said trial."

The second bill of exceptions contains the affidavit of W. E. Chilton, which was filed after the sentence had been pronounced against the prisoner, and shows, that the facts set up in P. C. Russell's affidavits were not discovered until a day or two before the sentence was pronounced, and the affidavit of said Russell could not be procured, until after sentence was pronounced, and that Russell had been evading the person employed to procure the affidavit to prevent his affidavit from being taken.

The prisoner's affidavit was also taken, in which he says as soon as he ascertained what Russell knew, he sent for Chilton his counsel and instructed him to do all in his power to procure the affidavit of said Russell, before the court disposed of the prisoner's motion for a new trial; that affiant did not, nor does he know, that the facts within Russell's knowledge were known to anybody else.

Russell's affidavit is as follows : "That sometimes he stops at the Hale house, a hotel in the city of Charleston, Kanawha county, West Virginia; that he was stopping at said hotel on the 5th day of January, 1882, while the jury in the case of the *State* v. *Wm. H. Robinson* for murder were stopping at said hotel; that on the said 5th day of January, 1882, while affiant was sitting in the office of said hotel, affiant saw James T. Calvert come down the stairway of said hotel with two jurymen in said case in charge; that the two jurymen went into the privy of said hotel, and said Calvert came into the office where affiant and others were; that while said two jurymen were in said privy, affiant saw a gentleman by the name of of Hanna go into said privy, where said two jurymen were; that said Calvert had his back turned to the door of said privy, and was walking towards affiant, when said Hanna entered said privy as aforesaid; that said privy does not open

into the office of said hotel but opens into a small hall or passage which connects another hall leading into said office with the bar-room connected with said hotel, and said privy. Affiant further says that some other person unknown to affiant, had just gone into said privy, before said two jurymen went in as aforesaid, and said unknown person was in said privy at the time said two jurymen and said Hanna went into the same as aforesaid. Affiant further says that a short while from the occurrence of the facts hereinbefore stated, said two jurymen, came out of said privy at the same door, at which they went in, and were taken up the stairway of said hotel, by said James T. Calvert."

The affidavit of James T. Calvert taken before the affidavit of Russell shows the situation of the two rooms, in which the jury were kept at the Hale House, that the Hale House was the best hotel in the city and the arrangement made for the jury in that house was the best that could be made. In his affidavit he further states, "that said jury was in no wise tampered or interfered with at any time, by any person during their service, nor was any opportunity afforded or offered to any one to tamper or interfere with the jury in any respect whatever at any time. * * * That while he was in charge of individual members of said jury who were necessarily separated from said jury at short periods, no opportunity was offered or afforded any person for talking to them about the case on trial, or tampering or interfering with them in any way, nor were they tampered or interfered with, or talked to by any one."

The court on the affidavit of Russell referred to set aside the sentence and verdict and grant a new trial.

We will now take a view of the authorities upon the misconduct and separation of the jury. As this is a new question in this State, we may be pardoned for this investigation, notwithstanding it makes the opinion a very lengthy one.

"The fact of the separation of the jury having been established by the prisoner the possibility that the jurors may have been tampered with exists and *prima facie* the verdict is vicious. This separation may be explained by the prosecution showing that the juror had no communication with other persons. In the absence of such explanation the mere

fact of such separation is sufficient ground for a new trial. The affidavit of a juror who left the balance of the jurors that he had not been tampered with during his absence is not sufficient evidence that he had not been tampered with." *Hines* v. *State*, 8 Humph. 597.   See also *Keenan* v. *State*, 8 Wis. 132; *Rowan* v. *State*, 30 Wis. 129; *State of Minn.* v. *Parrant*, 16 Minn. 178; *State* v. *Frank*, 23 La. An. 213.

"Where there has been an improper separation of the jury during the trial the prisoner if found guilty is entitled to the benefit of the presumption that the irregularity has been hurtful to him; and the *onus* is upon the State to show beyond a reasonable doubt that the defendant has sustained no injury on account of the separation." *Monroe* v. *State*, 5 Ga. 85.   See also *State* v. *Prescott*, 7 N. H. 287; *Jumpertz* v. *People*, 21 Ill. 375; *Maher* v. *State*, 3 Minn. 444; *McLain* v. *State*, 10 Yerger 241; *Keenan* v. *State*, 8 Wis. 132; *Woods* v. *State*, 43 Miss 364; *State* v. *Evans*, 21 La. An. 321; *Organ* v. *State*, 26 Miss. 78; *State* v. *Dolling*, 37 Wis. 396.

"That a juror after being charged with a criminal case was allowed to separate from the jury is ground of new trial unless it be affirmatively shown that he had no communication with any one upon the subject of the trial either directly by conversation or indirectly by overhearing the observation of others." *Daniel* v. *State*, 56 Ga. 653.   See also *Eastwood* v. *People*, 3 Parker Rep. 25.

"If after a cause has been submitted in a capital case a jury receive any kind of evidence which can have the most remote bearing on the case, it will be fatal to their verdict, where in a capital case after the testimony was closed several of the members of the jury while walking out for exercise by leave of the court and in charge of an officer visited and examined the place where the homicide occurred and in regard to which the witnesses had testified it was held to be a sufficient reason for granting a new trial." *Eastwood* v. *People*, *supra*.

"Affidavits of the jurors may be received to show that certain papers calculated to have an influence upon the case and which were alleged to have been exhibited to some of the jury out of court before the trial were not in fact shown to them or read in their hearing.   But when there is evidence of

improper conduct by a party or prosecutor in its nature calculated to influence the trial the affidavits of jurors can not be received to show in general terms that they founded their verdict upon the law and evidence laid down and given in on the trial and upon that only." *State* v. *Hascall*, 6 N. H. 352.

"After the jury had retired to deliberate upon their verdict the bailiff without the consent of the defendant or the leave of the court furnished to them at their request a volume of Bishop's Criminal Law. *Held*—That the misconduct was such as to entitle the defendant to a new trial. *Newkirk* v. *State*, 27 Ind. 1.

"If one or more jurors in a criminal trial separate without leave of the court so that such juror might have been improperly influenced by others the verdict will be set aside. *People* v. *Backus*, 5 Cal. 275.

"The separation of one of the jurors from his fellows during a criminal trial permitted by the officer in charge of the jury for necessary change of linen whilst the jury were passing the juror's house, the juror being absent no longer than was necessary to effect his purpose and under the eye of the officer in charge except when in the chamber in which he made the change is no ground for a new trial there being no proper ground to suspect that anything injurious to the rights of the prisoner occurred to the juror during his short absence from his fellows and when he was out of the sight of the officer. *State* v. *O'Brien*, 7 R. I. 336.

"The mere fact that the jury in a criminal case separate without permission of the court does not require that a new trial should be granted. The presumption that the jury may have been subject to improper influences which attaches to the fact of such separation may be removed by an affirmative showing that no injury to the defendant resulted therefrom. A new trial will not be granted because some of the jurymen in a criminal case may have conversed with third persons while deliberating upon their verdict if it be shown that such conversations were innocent." *People* v. *Symonds*, 22 Cal. 348.

"Where a defendant was convicted of murder and on motion for new trial it appeared three of the trial jurors after

their retiring but before verdict went for a few moments to a privy accompanied by the under sheriff who testified that during their absence from the jury-room they had no communication with any one nor with each other. *Held*: That the separation of the three jurors from their fellows was not cause for new trial." *People* v. *Bonney*, 19 Cal. 427.

"If after the jury have retired to deliberate on their verdict some of them separate from their fellows without leave of the court and without being attended by an officer a new trial will not be granted (unless our statute makes it imperative) if the verdict is clearly right upon the evidence; but if the correctness of the verdict be doubtful a new trial must be granted. But in all such cases the misconduct being established the burden is upon the prosecution to show that the offending jurors were not influenced adversely to the defendant or in any respect rendered less capable of discharging their duties." Then follows a query: "Whether the statute does not make it imperative on the court to grant a new trial for such cause." *Creek* v. *State*, 24 Ind. 151.

"Where there has been an irregularity or misconduct on the part of jurors which might affect their impartiality or disqualify them for the proper exercise of their reason and judgment their verdict should be set aside; but in other cases the proper mode of correcting the irregularity is by animadversion upon the conduct of the jurors or of the officers having them in charge where the jury in a capital trial had retired with the cause and one of the constables having them in charge, and a stranger carried reasonable refreshments into their room but no conversation respecting the cause took place between those persons and the jury, it was held, that the prisoner who was convicted was not entitled to a new trial." *Commonwealth* v. *Roby*, 12 Pick. 496.

"After a jury had retired in the case of a prisoner indicted for murder, they were taken from the jury-room by consent of the prisoner to a neighboring hotel, where rooms were provided for them, and where they dined at the public table, an officer sitting between them and the other guests; and while they were at the hotel, a barber was admitted to their room to shave some of them, and was there more than an hour, and for a few minutes without the presence of the

officer having them in charge; there was no proof of tampering with the jury either by the guests at the table or by the barber; on the contrary the officer stated, that he heard no one speak to them, on the subject of the trial, though the barber might have whispered to them, or delivered written communications on the subject; *Held*, that the prisoner was entitled to a new trial; it was not necessary for the prisoner to show, that the verdict was vicious; it was enough to show, that the common law rule had been violated, which prohibits the jury being spoken to by any one." *Boles* v. *State*, 13 Smedes & Mar. 398.

"A verdict will not be set aside on account of the misconduct or irregularity of a jury, even in a capital case, unless it be such as might affect their impartiality, or disqualify them from the proper exercise of their functions. If any ground whatever, appears for a belief, or even suspicion, that such a condition of things existed, a new trial ought to be freely granted. That the officers who were ordered by the court to take the jury to some convenient private place, kept them at a public inn, an officer being always with them, is no ground for setting aside the verdict. That one of the jurors on a visit home with the officer went into the house for a short time while the officer remained outside at the door will not vitiate the verdict it being made to appear by the State that nothing occurred which could raise a suspicion of the juror receiving any bias *ab extra*." *State* v. *Cucuel*, 31 N. J. L. 249.

"While an indictment for an assault with intent to murder was on trial in which it was claimed in defense that the prisoner was insane at the time of the act one of the standing jurors for the term who was not sitting in the case said to one of the sitting jurors after they had retired for the night to a room which they occupied together and where no one else was present *that he guessed the prisoner was a hard case and that he had heard that when he was in the book business at the South on a person refusing to take a book that he had subscribed for the prisoner drew two pistols and threatened to blow his brains out if he did not take it.* The communication was made without any corrupt motive and the juror testified that he paid little attention to it that it had no effect upon his mind. *Held,*—That a verdict rendered against

the prisoner ought to be set aside." *State* v. *Andrews*, 29 Conn. 100.

In *Wormley's Case*, 8 Gratt. 712, it appears that the prisoner had been convicted of murder in the first degree, and he moved for a new trial; and one of the grounds was misbehavior on the part of the officer and jury. The jury were sworn on Saturday; before any evidence was introduced on either side the court adjourned, and the jury was committed to the charge of the deputy sheriff. On the evening of the next day, Sunday, by invitation he went to the home of the clerk of the county court with the jury. On arriving the deputy sheriff and jury went into the parlors, and three gentlemen with them, the clerk, his son-in-law, and the guard of the jail. The sheriff went out of the room several times and left the jury, with the three other men in the parlor, but did not stay more than from five to ten minutes at any one time. The three gentlemen were examined, and they all said: "There was no conversation between either of them and any of the jurors in relation to the trial. They and the jury conversed freely together in the absence of the deputy sheriff, passing jokes and telling anecdotes, but there was no allusion to the trial." The court held, that where a sheriff, to whom a jury is committed in the progress of a criminal trial, walks with them to a neighboring house, and whilst there withdraws from the room, where they are, leaving them in company of three other persons, although these other persons swear there was no allusion by them to the trial during such absence of the officer, yet the verdict of the jury against the prisoner is to be set-aside, and a new trial directed."

As a result of the Virginia and other authorities in *State* v *Cartright*, *supra*, this Court held, that a mere separation of the jury was not sufficient ground for setting aside a verdict; but that where there had been an improper separation or a misbehavior of the jury during the trial, if the verdict is against the prisoner, he is entitled to the benefit of the presumption, that the irregularity has been prejudicial to him, and the burden of proof is upon the prosecution to show beyond a reasonable doubt, that the prisoner has suffered no injury by reason of the separation or misbehaviour. If the prosecution fails to do this, the verdict should be set aside.

The misconduct and misbehavior or irregularity of the jury, whether a separation, or something else, must be of such a character as to raise a presumption, that the prisoner was prejudiced thereby, before the prosecution will be called upon to rebut it; that the testimony of the jurors may be received to disprove, or explain, any such separation, misconduct or irregularity, but their testimony will not be received to show by what motives they were actuated, or that any admitted fact, misconduct or irregularity had no influence or effect upon their minds in producing the verdict; that in any case, where proper at all, the testimony of jurors should be received with great caution.

"Where upon a trial a material paper not read in evidence had been given to the jury by mistake a new trial was granted without costs." "The court refused to examine any of the jurors and observed that the court must be governed by the tendency of the paper apparent from the face of it; that it was not pretended that the jury had not read it, and it would be difficult for jurors where as in this case there was much evidence of different kinds clearly to decide in what manner their minds were influenced in forming their verdict. As it was received by the jury among other written evidence and read by them it must be presumed they considered it as evidence and gave due weight to it." *Whitney* v. *Whitman,* 5 Mass. 405.

"If a party deliver papers to the jury which he knows has not been read in the cause the verdict if in favor of such party will be set aside, whether the papers were material or not. But if a paper go to the jury by mistake and they do not examine it or if it be immaterial this will furnish no ground for setting aside a verdict. But if a material paper be delivered to the jury by mistake the verdict must be set aside. A party cannot be permitted in such a case to show by the testimony of the jurors that they were not influenced by the paper." *Page* v. *Wheeler et al.,* 5 N. H. 91.

In *State* v. *Cucuel supra* the chief justice for the court said, Page 263: "The next objection was that the newspaper containing what purported to be a report or abstracts of the evidence introduced at the trial was seen by two or three of the jurors. The evidence shows that these jurors read but

small portions of these reports. There were no editorial or other comments on the evidence or merits of the case in any of the newspapers. There is not the slightest ground to suspect that any juror has been mislead by any of the reports. The juror who read the most in them said they made no impression upon him. The paper containing these reports was freely used and referred to by the counsel from time to time before the court and jury. * * * * * * The officers were in fault in permitting these papers to go into the hands of the jury; but I am entirely unable to understand how it can be imagined that the perusal of scraps of evidence in these papers affected in the least degree the result of the case. If the jury in a criminal prosecution carry with them on retiring to consider of their verdict a paper having writing thereon which is folded accidentally with the instructions in the case and it is not shown that such unauthorized and detached paper has produced any improper influence on the jury nor is it apparent from its contents that it could have influenced the finding of the jury nor prejudiced the rights of the defendant it is not error for the district court to overrule a motion for a new trial based upon the reception and perusal of such paper by the jury." *State* v. *Taylor*, 20 Kansas 643.

"Where the officers attending upon the jury under mistake of duty permitted them to read the newspapers the officers first inspecting them and cutting out everything that in any manner related to the trial and it appeared that in point of fact the jury never saw anything in any newspaper relative to the trial and after the charge from the court were not allowed to see any until they had delivered their verdict, held, that it was an irregularity in the officer but not sufficient to justify the court in setting aside the verdict and granting a new trial or treating the matter as a mis-trial." *United States* v. *Giberi et al.*, 2 Sumner 19.

In *United States* v. *Reid et al.*, 12 How. 361, a motion was made for a new trial in support of the second objection the voluntary affidavit of two of the jurors were taken, one deposed: "That while the case was on trial and the jury was impaneled a newspaper was sent to him by some of his family from his counting room. It was a newspaper for

which he was a subscriber which was regularly left at his counting house and which he was accustomed to read. He looked slightly over it and saw that it contained a report of the evidence which had been given in the case under trial a part of which he read and put the paper in his pocket; that while the jury were in their room deliberating on their verdict he read over the report of the evidence in the newspaper; he read it from curiosity and thought it correct and that it refreshed his memory; but it had no influence on his verdict and that he had made up his mind before he read it. There was no conversation about the newspaper report in the jury room, nor did he speak of it there to any one nor does he know that the other jurors knew that the report of the evidence was in the newspaper they saw him reading. The other juror deposed that he saw this newspaper while the jury was impaneled in the court room and upon looking at it saw that it contained a report of the evidence that had been given in the case under trial. He looked over a few sentences and put the paper aside and did not see it afterwards. He did not think the report accurate; it had not the slightest influence on his judgment."

Taney, C. J., said: "The first branch of the second point presents the question whether the affidavits of jurors impeaching their verdict ought to be received. It would perhaps hardly be safe to lay down any general rule upon this subject. Unquestionably such evidence ought always to be received with great caution. But cases might arise in which it would be impossible to refuse them without violating the plainest principles of justice. It is however unnecessary to lay down any rule in this case or examine the decisions referred to in the argument. Because we are of opinion that the facts proved by the jurors if proved by unquestioned testimony would be no ground for a new trial. There was nothing in the newspapers calculated to influence their decision and both of them swear that these papers had not the slightest influence on their verdict."

Was there such an improper separation of the jury in this case, as to require the verdict to be set a side for that reason, unless it was shown to the court beyond a reasonable doubt, that the prisoner suffered no injury by the separation? It was clearly shown by the affidavit of P. C. Russell, that two

of the jurors came down the steps of the hotel, at the foot of which steps the officer in charge of them went to the stove, and that they went into the water-closet; that the officer's back was turned to the water-closet, so that he could not see the door or observe who went in, if any one; that just before the two jurymen went into the the water-closet, some one unknown to the affiant had just gone in to the water-closet, and shortly after, a man named Hanna went into the same water-closet, and the two jurymen and the two strangers were there alone for some time, when the two jurymen came out, and with the officer they went up stairs. This according to all the authorities, was such a separation of the jury, as would entitle the prisoner to a new trial, unless it was shown, that the prisoner suffered no injury thereby.

In *Wormley's Case* the court disregarded the testimony of the three strangers, that nothing whatever was said during the separation about the case. We will not say in this case under the rule laid down, that if the affidavits of Hanna and the other persons had been taken, or of Hanna alone, that there was nothing said about the case during the separation, it might not show to the satisfaction of the court, that the prisoner suffered no injury by the separation. But here there is no affidavit of either of the strangers. Was the fact of the separation established? It is true, that the jury say in a general way, and so does Calvert the officer in charge of the two jurymen says in his affidavit in a general way, that there was no separation of the jury. But these affidavits were taken before that of Russell, and the attention of neither the jurymen nor Calvert was directed to this particular fact. Indeed, Russell in his affidavit shows, that Calvert's back was turned so he could not see the two strangers go into the water-closet, and his affidavit no doubt was consequently made, as he did not suppose any other person was in the water-closet. But it was his duty to see, that no one else was there. He ought to have gone with the jurymen at least to the door, and been certain, that no one could have the opportunity of tampering with the jurors.

Calvert's affidavit is not taken. The excuse given for this is, that Calvert had left for his home in a distant part of the county, when the motion was made to set aside the sentence

and verdict and grant a new trial, based on the affidavit of
Russell then filed. And the same excuse is given for the
non-production of the affidavits of the two jurors. But as a
sufficient reason is given why the affidavit was not sooner
taken and filed, and as the court had not yet adjourned, this
excuse for the non-production of counter affidavits will not
avail. The affidavits of the said Calvert and the two jury-
men, and Hanna, as far as the record showed, might
have been produced. The fact, that the judge of the court
desired to adjourn the term, was no sufficient reason for
failing to wait under the circumstances to obtain the affida-
vits. Under the law the prisoner had *prima facie* shown,
that he was illegally convicted; and unless it was shown by
the State, that the matter, of which he complained, did him
no injury, it was the bounden duty of the court to set aside
the verdict and grant him a new trial. In refusing to do so
the court erred to the prejudice of the prisoner.

Was the prisoner entitled to have the verdict set aside and
a new trial granted him, because sealed letters were received
by some of the jury during the trial? This is a new ques-
tion; which, the investigation by the counsel and the
court does not show, has been decided. The facts are
clear, that there were no restrictions placed upon the jury by
the officers in charge or by the court as to the reception of
mail matter during the trial. It is also undisputed, that
three of the members of the jury, during the trial received
sealed letters, one four, another, two, and the third one. It
is true, that each of these jurors swears, that the said letters
nor either of them had any reference to the case before
them; but the letters are not produced, and we only have the
testimony of the jurors, that they received no other letters,
and that those received did not relate to the case, while it is
a conceded fact, that there was not the slightest restriction
placed upon the jury in the reception of all mail matter that
might be sent them through the postoffice or otherwise.

The reason, why a jury is required to be kept together,
deprived of social intercourse, not even allowed to visit their
families without the attendance of an officer, is, because it is
regarded to be absolutely necessary to the due administra-
tion of justice; that in a criminal trial where a man's life or

his liberty is committed to the keeping of a jury of his peers,. it is his right, that they shall be kept absolutely free from all outside influence, which might prejudice his case with the jury and do him injury.  It is a most sacred charge, that the jury have in their keeping.  If an improper separation of the jury is a just ground for setting aside a verdict in a criminal case, it seems to us for a much stronger reason, is the reception of uninspected and sealed letters.  There is much better opportunity to detect any improper influence exerted upon a juror, who leaves his fellows, and goes into the street and among the people, than to detect the same or a worse influence exerted upon him by a sealed letter sent to the same juror through the postoffice or otherwise.  We may guard against the former, but it seems impossible to guard against the latter.

The reception of sealed letters by jurors during the trial of a prisoner especially a capital case renders the verdict vicious, and it should be set aside and a new trial granted, the prisoner, who has been convicted, although the jurors in the absence of the letters swear that none of such letters so received in any manner related to the case on trial.  Under any circumstances we have seen that the testimony of jurors as to their misconduct or irregularity ought to be received with caution. In a case like this, where the letters are not produced, and it is not except from the testimony of the jurors shown, how many were received, the testimony of the members of the jury, that the letters received did not relate to the case on trial, is not sufficient to rebut the presumption from the receipt of sealed letters during the trial, that the prisoner was injured thereby.  A sound public policy requires this rule.  If the jury are permitted to receive sealed letters during the trial of a felony case, then in such a case the jury might as well not be kept together at all.  No one would say, if a jury disregarding the charge of the court should separate and go among a crowd of people, that the verdict rendered by them against a prisoner in a felony case ought not to be set aside, although every juror might swear, that he had no conversation with any one on the case they were trying, and heard nothing said by others in relation thereto. The receipt of sealed letters it seems to me, is more danger-

ous to the liberty of the citizen than a separation of the jury, in such manner as I have indicated.

All the letters received by the jury ought first to be inspected by the court trying the case. The court is both the guardian of the life and liberty of the citizen, as well as of the dearest interests of society; and no letters ought to be permitted to be received by the jury or by any member thereof, who are trying a felony case, without being first inspected by the court, so that the court could know that no influence calculated to injure the prisoner or the State was in that way brought to bear upon the jury. If under such circumstances the members of the jury to whom letters are addressed, do not wish such letters to be opened and inspected by the court, then they should remain unopened until the trial is ended. Life and liberty are too sacred to be jeopardized by the acceptance of sealed letters by juries, when trying a fellow man, for felony.

Did the court err in refusing to set aside the verdict and grant a new trial, because the jury were permitted to receive and read the newspapers, as set out in the affidavits? Public policy does not require, that newspapers should be excluded from the jury while deliberating upon a capital or other felony case. No newspaper however ought to be permitted to go to such a jury until it is first inspected by the court, and all matter improper for them to read cut out. The reading of such newspapers is calculated to relieve the jury, and refresh them, and make them the better able to discharge their duties in a long tedious trial. The mere reading of newspapers by a jury under such circumstances will not vitiate a verdict rendered against the prisoner, unless such newspapers contain matter calculated to influence the minds of the jury against the prisoner to his prejudice in the trial.

Although friends and relatives of the Gibbons family, members of which were victims of the horrible Ashland tragedy, lived in Charleston; and all the sickening details of that combination of burglary, rape, murder, and arson were read by the jury in the Cincinnati *Enquirer*, yet we do not think, that that was calculated to prejudice the minds of the jury against the prisoner. It had no relation to the facts or circumstances of the case being tried by them. It cannot be

supposed, that they would conclude, that because a horrible murder had recently been committed in Kentucky, Robinson was guilty of murder and should be found guilty thereof.

But the articles in the Washington *Post* detailing the evidence of experts on the question of insanity as a defense to homicide, we think, stands on a very different footing. The main defense relied on by counsel for Robinson was insanity. The only defense relied on in Guiteau's case was insanity. The expert Dr. Gray was examined at length on the subject of insanity; and his opinions on that subject, as reported in newspapers, were read by the jury, and from what was read the jury might well infer, that the distinguished Dr. Gray believed, that insanity was sometimes feigned. Again, Dr. Gray ridiculed the idea of "moral insanity," declaring, that "dypsomania" was not insanity but "drunkenness." It was claimed in this case, that Robinson was insane from previous habits of intoxication; that he had been so long addicted to the use of intoxicating liquors, that insanity was superinduced thereby. The statement of Dr. Gray was calculated to shake the belief of the jury, if any such they had, that by the long continued use of intoxicating liquors a man might become insane. We have seen, that a verdict was set aside, because the jury got hold of a work on criminal law and read from it, while they were trying a man for murder. It is certainly more dangerous for them to read from a newspaper, what purports to be the testimony of an expert on the subject of insanity, when that is the very subject, which they are considering. We think the reading of the newspaper account of the expert testimony on the subject of insanity in the Guiteau case was calculated to prejudice the case of the prisoner; and the court erred in refusing to set aside the verdict for this reason.

There is nothing in the objection, that the jury occupied two rooms at the hotel, an officer being in charge in each room. In *Thompson's Case*, 8 Gratt. 637, the jury were kept in five rooms. It was held not a separation, for which the prisoner would be entitled to a new trial.

As to the motion for a new trial, because the verdict was contrary to evidence, that cannot be considered here. As a new trial must be had, it would be manifestly improper for

us to express any opinion upon the sufficiency of the evidence
to sustain the verdict.    *Abbott's Case*, 8 W. Va.

The judgment and sentence of the circuit court of Kana-
wha county is reversed; and this Court proceeding to ren-
der such judgment as the circuit court should have rendered,
the verdict of the jury is set aside, and a new trial granted.

THE OTHER JUDGES CONCURRED.

JUDGMENT REVERSED.    NEW TRIAL AWARDED.